949 F.2d 644
 60 USLW 2388, Fed. Sec. L. Rep. P 96,295,
21 Fed.R.Serv.3d 468
 Harriet LEWIS, on Behalf of herself and all others similarly situated,
v.
CHRYSLER CORPORATION; Lee A. Iacocca; Gerald Greenwald;
Robert A. Lutz; Robert S. Miller, Jr.; Joseph E. Antonini;
Bennett E. Bidwell; Owen F. Bieber, Anthony J. Bryan;
Joseph A. Califano; A. Jean Grandpre; Earl G. Graves;
Ronald H. Grierson; Juanita M. Kreps; Kent Krese; Robert
J. Lanigan; Peter A. Magowan; Harriet Lewis, Appellant.
 No. 91-1222.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 15, 1991.
Decided Nov. 12, 1991.
 
 Mark C. Rifkin (Argued), Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., for appellant.
 Laurence Z. Shiekman (Argued), Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees.
 Before COWEN, NYGAARD and WEIS, Circuit Judges.
 OPINION OF THE COURT
 NYGAARD, Circuit Judge.
 
 
 1
 In this appeal we decide that a class of shareholders of Chrysler Corporation has not stated a claim against the company and its board directors (collectively "Chrysler") under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1990), and Rule 10b-5 promulgated thereunder. The district court twice dismissed the class action under Fed.R.Civ.P. 12(b)(6), reasoning that the shareholders lacked standing to sue under the securities fraud statute and rule. We will affirm but on another ground, namely, failure to allege with particularity any misrepresentation or omission actionable under § 10(b) or Rule 10b-5.
 
 I.
 Facts[1]
 
 2
 In February 1988 Chrysler adopted a shareholder rights plan, commonly known as a "poison pill".[2] [p 12] Under the Plan, Chrysler stockholders received one preferred share purchase right on each outstanding share of Chrysler common stock. [p 12] Each purchase right could be exercised following certain triggering events, that is 10 days after the first public disclosure that a person or group acquired, or obtained the right to acquire, beneficial ownership of 30% or more of Chrysler's outstanding common stock, or 10 days after the first public disclosure or actual commencement of a tender or exchange offer intended to result in the offeror becoming the beneficial owner of 30% or more of Chrysler's outstanding common stock. [p 14]
 
 
 3
 When exercisable, the purchase rights entitled Chrysler stockholders to purchase 1/100th of one share of Junior Participating Cumulative Preferred Chrysler Stock ("poison pill preferred") from the company at a purchase price of $120. [p 12] Additionally, the Plan provided that following certain events the poison pill preferred purchase rights would entitle holders to exercise "flip-in" rights to buy Chrysler common stock at one-half market value or, alternatively, "flip-over" rights to buy common shares in an entity whose announced or actual acquisition of Chrysler common stock triggered the exercise of purchase rights. [pp 13, 15]
 
 
 4
 Allegedly, the Plan was originally enacted by Chrysler's board in order to cement their control and domination over the company. [p 10] Furthermore, the Plan as originally enacted was intended to conceal Chrysler management's entrenchment motives from company shareholders and the investing public. [p 11]
 
 
 5
 In 1989, Chrysler amended the Plan to reduce the 30% threshold of an acquiring entity's beneficial ownership in Chrysler needed to trigger exercise of shareholder rights under the Plan to 20%. [p 16] The 1989 amendments also added an additional "flip-in" event: Chrysler shareholders would be entitled to purchase, at one-half market price, common stock of any would-be acquiror if Chrysler's Board of Directors declared such acquiror to be an "Adverse Person" after determining that he had become the beneficial owner of at least 10% of Chrysler common stock then outstanding, and that such beneficial ownership is intended to cause the company to repurchase the acquiror's shares or would cause a material adverse impact on Chrysler's business. [p 16]
 
 
 6
 On December 14, 1990, Chrysler issued a press release which announced further amendments to the Plan. [p 20] This Release, which is the focus of appellants' federal securities fraud claim, read as follows:
 
 
 7
 CHRYSLER REPORTS UNSOLICITED STOCK PURCHASE BY KERKORIAN;
 
 ANNOUNCES AMENDED SHARE PURCHASE RIGHTS PLAN
 
 8
 HIGHLAND PARK, Mich.--Chrysler Corporation announced today it had been informed that Mr. Kirk Kerkorian had acquired in excess of nine percent of Chrysler's outstanding common stock.
 
 
 9
 Chrysler said that Mr. Kerkorian's stock purchase was not solicited by the Company.
 
 
 10
 The Company said that it had not yet received a Schedule 13D report by Mr. Kerkorian and would not comment on his motives for such an investment.
 
 
 11
 In addition, Chrysler's Board of directors today adopted amendments to the Company's share purchase rights plan.
 
 
 12
 The amendments reduce from 20 percent to 10 percent the threshold of beneficial ownership at which the rights "flip-in"--that is, become exercisable to buy Chrysler stock at half-price. The rights plan now provides that if someone acquires beneficial ownership of 10 percent of Chrysler's common stock, each of the rights (other than those held by the 10 percent holder, which become void) entitles the holder, upon payment of the $120 exercise prices, to buy Chrysler common stock having a market value (as defined in the rights plan) equal to twice the exercise price.
 
 
 13
 Prior to the amendments adopted today, the rights plan provided that, if someone acquired beneficial ownership of 10 percent or more of the Company's common stock, the rights would flip in if Chrysler's directors determined that the acquirer was an "adverse person", and otherwise flipped in if someone acquired beneficial ownership of 20 percent of the Company's common stock.
 
 
 14
 The amendments also add a provision that, if someone acquires 10 percent, but less than 50 percent, of the Company's common stock, the Board of directors may exchange each right (other than those held by the 10 percent holder) for one share of common stock.
 
 
 15
 The Company said: "The amendments adopted today are intended to enhance the ability of Chrysler's Board to act in the best interest of all the Company's shareholders if someone should seek to obtain a position of control or substantial influence over Chrysler.
 
 
 16
 (Emphasis in amended complaint.)
 
 
 17
 Appellant alleges that the amended Plan renders a substantial outside acquisition of Chrysler common stock economically unfeasible and prohibitively expensive; and that the Plan gives Chrysler's board unilateral power to block a takeover whether or not it would be in the stockholders' best interests, if the acquiror is unwilling to meet the personal demands of the board members. [p 24] Allegedly too, the last amendments to the Plan changed the nature of stockholders' investments in Chrysler [p 23], chilled interest in Chrysler stock, deterred Kerkorian and other investors from making future purchases of common shares, and effectively caps the price at which Chrysler stock is traded [p 28]--all of which has or will cause economic damage to Chrysler stockholders. [p 31]
 
 II.
 Dismissal of Appellant's Complaints
 
 18
 Four days after the December 14, 1990 amendments to the Plan, appellant Harriet Lewis filed her original complaint in district court on behalf of herself and other Chrysler shareholders similarly situated. The Original Complaint advanced two counts: the first alleged Chrysler violated the anti-fraud provisions of § 10(b) and Rule 10b-5; the second alleged Chrysler board members breached their state law fiduciary duties to the company's shareholders.
 
 
 19
 On January 22, 1991, Chrysler filed a Rule 12(b)(6) motion to dismiss the federal securities fraud count, and a Rule 12(b)(1) motion to dismiss the pendent state law count for lack of subject matter jurisdiction. At oral argument on Chrysler's motions to dismiss, appellant offered to submit an amended complaint within one week. She did not.
 
 
 20
 On February 25, 1991, the district court dismissed both counts of the Original Complaint. The court reasoned that appellant and the class members lacked standing to sue under § 10(b) and Rule 10b-5 because the Original Complaint did not allege facts which, if true, made the class members either "purchasers" or "sellers" of securities within the meaning of the statute and the rule. The court then dismissed the state law count for lack of pendent jurisdiction.
 
 
 21
 On February 27, 1991, apparently before receiving a copy of the court's dismissal opinion and order, appellant filed an amended, three count complaint. The first count alleged violations of § 10(b) and Rule 10b-5, and expanded the factual allegations in the Original Complaint. The second count sounded in breach of fiduciary duties, and the third alleged a violation of § 242 of Delaware's General Corporation Law.[3] 8 Del.C. § 242 (1990).
 
 
 22
 Appellant filed a motion to reconsider the dismissal of her Original Complaint, and Chrysler filed a motion to strike or dismiss the Amended Complaint. The district court denied appellant's motion, and granted Chrysler's motion by dismissing the Amended Complaint. The district court concluded that the Amended Complaint failed for the same reasons as the Original Complaint to state a claim under § 10(b) and Rule 10b-5.
 
 III.
 Standard and Scope of Review
 
 23
 The class appeals the district court's orders granting Chrysler's Rule 12(b)(6) motion to dismiss the Amended Complaint, and denying appellant's motion to reconsider the 12(b)(6) dismissal of her Original Complaint. We will review both orders in turn. We exercise plenary review in each instance.[4]
 
 IV.
 
 24
 The Requirement of a Material Misrepresentation in Private
 
 Actions Under Section 10(b) and Rule 10b-5
 
 
 [5]
 
 
 
 
 25
 Section 10(b) of the Exchange Act prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission ('SEC') ] may prescribe." Congress has granted the SEC the power to promulgate rules governing application of section 10(b). The relevant SEC rule, Rule 10b-5, provides that:
 
 
 26
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality or interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 27
 (a) To employ any device, scheme, or artifice to defraud.
 
 
 28
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 29
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 30
 in connection with the purchase or sale of any security.
 
 
 31
 17 C.F.R. § 240.10b-5 (1990).
 
 
 32
 The statute and the rule reflect "a strong federal interest ... in ensuring a proper flow of information between the parties to a securities transaction." Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 646 (3d Cir.1980). The fundamental purpose of the Securities Exchange Act is to implement "a philosophy of full disclosure". Santa Fe Industries, Inc. v. Green, 430 U.S. 462 at 477-78, 97 S.Ct. 1292 at 1303, 51 L.Ed.2d 480.
 
 
 33
 In order to state a securities fraud claim under § 10(b) and Rule 10b-5, a private plaintiff must plead the following elements:
 
 
 34
 1) a false representation of 2) a material 3) fact; 4) defendant's knowledge of its falsity and his intention that plaintiff rely on it [although recklessness, as opposed to actual intent, will suffice]; 5) the plaintiff's reasonable reliance thereon; and 6) his resultant loss.
 
 
 35
 Zlotnick v. TIE Communications, 836 F.2d 818, 821 (3d Cir.1988) (citations omitted) (emphasis added).
 
 
 36
 A key issue when corporate mismanagement is alleged under § 10(b) or Rule 10b-5 is whether the plaintiff has alleged a misrepresentation or omission in the flow of material information. See Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 639 (3d Cir.1989). "The line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw." Id. The difference is significant, because "the fairness of the terms of [a] transaction is beyond the scope of the Act.... [A] breach of fiduciary duty, unaccompanied by misrepresentation, nondisclosure, or deception, does not violate the statute or the Rule...." Id. at 638, citing Sante Fe Industries, Inc. v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (acts of corporate mismanagement do not violate § 10(b) or Rule 10b-5 in the absence of a material deception, misrepresentation, or failure to disclose).
 
 
 37
 The Supreme Court has been "careful not to set too low a standard of materiality" in order to avoid "an overabundance of information" especially concerning corporate developments of "dubious significance". See Basic v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Information is "material" if there is a substantial likelihood that, under all the circumstances, the information would have assumed "actual significance in the deliberations of the reasonable shareholder." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); Basic, 108 S.Ct. at 983 (expressly adopting the materiality standard of TSC Industries for use in § 10(b) and Rule 10b-5 cases).
 
 
 38
 Omitted information is material if there is a " 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " Basic, 108 S.Ct. at 983, quoting TSC Industries. When the impact of a corporate development is "contingent and speculative in nature" it may be "difficult to ascertain whether the 'reasonable investor' would have considered ... omitted information significant at the time." See Basic, 108 S.Ct. at 983.
 
 V.
 Original Complaint
 
 39
 We will affirm the denial of appellant's motion for reconsideration because appellant's Original Complaint did not state a claim under § 10(b) or Rule 10b-5. That complaint alleges deception and manipulation generally [pp 3, 7(d)(ii), 14, 16], breach of fiduciary duties [p 7(d)(11) ], and a conspiracy to effectuate a plan and scheme whereby Chrysler board members would: retain their positions on the board "for their sole benefit" [p 6(q) ], prevent Kerkorian from obtaining control of the company and removing board members from their positions [p 12], frustrate and deter future bids for or acquisitions of Chrysler stock by persons hostile to Chrysler management [pp 7(d)(i), 15], and manipulate the market and trading price for Chrysler's shares. [pp 7(d)(i), 15, 17]. The complaint also alleges that the December 14, 1990 amendment to the poison pill plan and Chrysler's announcement of it were allegedly undertaken to further Chrysler's preexisting conspiracy to prevent Kerkorian from taking control and displacing Chrysler's current management [pp 11, 12]; and that the amended Plan has or will deprive class members of their "equity interest in the Company." [p 7(b) ]
 
 
 40
 Although it alleges fraud and manipulation generally, and also breach of fiduciary duties, the Original Complaint fails to state a claim under § 10(b) or Rule 10b-5 because it fails to allege any particular misrepresentation or omission of material fact. Thus, the Original Complaint fails to plead, with the particularity required by Fed.R.Civ.P. 9(b),[6] an essential element of every § 10(b) or Rule 10b-5 action.
 
 VI.
 Amended Complaint
 
 41
 Appellant's untimely Amended Complaint repeats and expands upon the general allegations of fraud, deception, manipulation, breach of fiduciary duty and conspiracy contained in the Original Complaint. The Amended Complaint more fully describes the poison pill Plan, Chrysler's amendments to it, the amended Plan's alleged effects on stockholders, and the board's alleged motives and scheme to enact the Plan and its amendments. Nevertheless, like the Original Complaint, the Amended Complaint fails to allege with particularity any misrepresentation or omission cognizable under § 10(b) or Rule 10b-5. Only a few allegations in the Amended Complaint merit discussion.[7]
 
 
 42
 In p 20, appellant recites the language of the Release which is her central and most specific allegation of fraud. In the Release, the Company allegedly said (emphasis in Amended Complaint):
 
 
 43
 The amendments adopted today are intended to enhance the ability of Chrysler's Board to act in the best interest of all the Company's shareholders if someone should seek to obtain a position of control or substantial influence over Chrysler.
 
 In p 26, appellant avers that:
 
 44
 The Release was false and misleading in material respects and was intended to deceive Chrysler's shareholders and the investing public in at least the following ways:
 
 
 45
 (a) the Release portrayed the Poison Pill amendments as in the best interests of the Company's shareholders when, in fact, only management benefits from the amendment;
 
 
 46
 (b) the Release failed to disclose the effects of the amendment on shareholders' rights and failed adequately to disclose the new rights given to Chrysler's management under the amendment; and
 
 
 47
 (c) the Release failed to disclose the cost to shareholders of the amendment in terms of the change in the nature of their investment (including the forfeiture of a control premium on their Chrysler shares).
 
 
 48
 Appellant alleges another fraudulent statement is attributable to Chrysler management: allegedly, Chrysler board member Lutz was quoted on December 19, 1990 in The Wall Street Journal "as stating that stiffening the Poison Pill was the 'prudent thing to do' because he was not sure that Kerkorian's intentions would not be hostile to current management." [p 22] Appellant alleges further that "Lutz did not claim that the amendments to Chrysler's Poison Pill were prudent to protect the Company or its stockholders." [id.]
 
 
 49
 Characterizing both the Release and Lutz's alleged statement as frauds, Lewis argues on appeal that
 
 
 50
 appellees affirmatively stated that the Poison Pill amendment was prudent and in the shareholders' best interest. These statements were false and misleading. Furthermore, by volunteering such statements, appellees undertook an obligation to make their statements fair and complete--which required at a minimum that they disclose their own benefit from the Poison Pill amendment, the effects of the amendment on shareholders' rights, and the cost to shareholders of the amendment. Appellees' material misstatements and omissions have negatively affected the flow of information in the marketplace concerning the Poison Pill amendment, and constitute a violation of Section 10(b) of the Exchange Act and Rule 10b-5.
 
 
 51
 [Appellant's Reply Brief at 9.]
 
 
 52
 Appellant is incorrect. First, contrary to appellant's allegation in p 26(a), the plain language of the Release did not portray the amended Plan as being in the shareholders' best interests. The Release said only that the amendments were "intended to enhance the ability of Chrysler's Board to act in the best interest of all the Company's shareholders if someone should seek to obtain control ... over Chrysler." It did not pronounce upon the December 14, 1990 amendments in terms of shareholder interests--it said merely that the Plan was amended to give Chrysler's board of directors increased wherewithal to act in the shareholders' interest in the future. The Release did not inform investors that, by amending the Plan, Chrysler had or necessarily would ever act in shareholders' best interests.
 
 
 53
 It follows that the Release did not say what Lewis alleges it did, and so it does not support the gist of appellant's allegation of fraud in p 26(a). Since the Release did not portray the Plan amendments as being in the shareholder's best interests, it was not false and misleading in that respect even if, as alleged, the amended Plan benefits only management.
 
 
 54
 Second, the Release did not impose on Chrysler a duty to disclose how the amended Plan benefits management. Chrysler's failure to say how management might use the amended Plan to its own advantage is not an actionable omission of material fact because the investing public is charged with "knowledge of information of which they reasonably should be aware", which includes "the 'universal' interest of corporate officers and directors in maintaining corporate control." Warner Communications Inc. v. Murdoch, 581 F.Supp. 1482, 1492 (D.Del.1984). Knowing that, and also the Release which accurately described the substance of the amendments, Chrysler shareholders cannot prevail on the theory they were misled about the possibility management might use the amended Plan to frustrate an outside effort to wrest control of the company.
 
 
 55
 The claim that Chrysler was obligated to disclose that the amendments benefitted management is, in effect, a claim that Chrysler misrepresented the amendments by failing to reveal management adopted them as part of its entrenchment scheme. While management motives in changing the Plan may have been self-serving as alleged, Chrysler's failure to disclose management's entrenchment scheme is not actionable under the federal securities laws.
 
 
 56
 "The unclean heart of a director is not actionable, whether or not it is 'disclosed', unless the impurities are translated into actionable deeds or omissions both objective and external." Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978). "[C]orporate officers and directors do not violate the federal securities laws by failing to disclose an entrenchment motive or scheme underlying their actions." Warner Communications, 581 F.Supp. at 1490. Indeed, "the decision to resist a takeover is within the scope of directors' state law fiduciary duties, and there is no federal securities law duty to disclose one's motives in undertaking such resistance." Panter v. Marshall Field & Co., 646 F.2d 271, 290 (7th Cir.), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). This is because "the general rule [is] that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions." Warner Communications, 581 F.Supp. at 1490.
 
 
 57
 The policy considerations underlying the general rule are as follows:
 
 
 58
 First, in the absence of such a rule, parties would be placed in the untenable position of either publicly confessing their potential misconduct before their guilt is properly determined by a court, or incurring liability for damages resulting from their failure to disclose the misconduct. Second, absent such a rule, instances of misconduct which do not constitute securities fraud but which constitute violations of state law, would, nevertheless, often give rise to a 10b-5 claim for failure to disclose the misconduct. As a result, the state law claim would effectively be boot-strapped into a 10b-5 claim and brought into the federal courts for resolution, circumventing the federalism considerations underlying Santa Fe Industries, Inc. v. Green [citation omitted]. Third, the rule does not significantly impede the flow of material information to investors. The rule limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct.
 
 
 59
 Id. Accordingly, appellant "may not 'bootstrap' a state law claim into a federal case 'by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.' " Kademian v. Ladish Co., 792 F.2d 614, 622 (7th Cir.1986).
 
 
 60
 For the same reasons, we reject appellant's argument that if the Release affirmatively portrayed the amendments as being in the shareholders' best interests, Chrysler became obligated to reveal that the Plan would facilitate management's entrenchment interests. See Biesenbach, 588 F.2d at 402 (management statement that transaction was in shareholders' interest when allegedly it was not does not support securities fraud claim); see also Kademian, 792 F.2d at 623-624 (no duty to disclose true purpose or motives for corporate transaction even following express statement of other purported reasons for same, as long as there has been no false allegation of factual matter).
 
 
 61
 Third, contrary to the allegation at p 26(b), the Release did accurately describe the substance of the amendments' effects on shareholder and management rights under the Plan. Since shareholders are charged with knowledge that "companies almost invariably engage in defensive tactics when faced with an undesired takeover bid", Warner Communications, Inc., 581 F.Supp. at 1492, we conclude the Release did not deceive investors about how Chrysler's board could use its rights under the amended Plan to thwart a takeover of the company and deprive Chrysler shareholders of the opportunity to sell their shares for a "control premium".
 
 
 62
 Fourth, Chrysler's failure to "disclose the cost to shareholders of the amendment" is not actionable under § 10(b) and Rule 10b-5. While "[t]he task of determining whether a given omission is material is especially difficult when the plaintiff alleges nondisclosure of 'soft' information.... such as opinions, motives, intentions, or forward looking statements, such as projections, estimates and forecasts", Craftmatic, 890 F.2d at 642--and even though the ultimate materiality of an omission should not be decided as a matter of law unless "reasonable minds could not differ", id. at 641--nevertheless, we have no difficulty concluding as a matter of law that any management estimate of "the cost" to Chrysler shareholders of the amendments would not be material for § 10(b) and Rule 10b-5 purposes.
 
 
 63
 Pre-planned defensive strategies like the Plan "are inherently contingent in nature". Warner Communications, 581 F.Supp. at 1491. It follows that estimates of the amended Plan's financial effects on shareholder wealth would be wholly speculative and depend upon the Plan's actual operation in the context of some as yet undeveloped future attempt to acquire control of Chrysler in the face of the Plan. Understandably, Chrysler management never talked publicly about the amendments' future financial impact on shareholder wealth.
 
 
 64
 We hold that any prediction on December 14, 1990 of the Plan amendments' "cost to shareholders" would have been so speculative and unreliable as to be immaterial as a matter of law, and the failure to make such a prediction cannot be the basis for finding a securities fraud violation. See Craftmatic, 890 F.2d at 644. If Chrysler's board could be liable for that omission, then companies like Chrysler would be forced to either speculate on matters of future valuation, or else forgo any public announcement of important corporate developments like the Plan amendment in this case. We will not impose such a rule.
 
 
 65
 With respect to Director Lutz's alleged statement reported in The Wall Street Journal, we hold it does not constitute a § 10(b) or Rule 10b-5 violation. Lutz's statement, that the amendments were "prudent" in terms of management interests because Kerkorian might be "hostile to current management", cannot be a misrepresentation of material fact because Lutz's statement is consistent with appellant's allegations (which we must accept as true) that management's entrenchment motives prompted the amendments and they benefit only management. [p 26(a) ] In other words, Lutz's statement reflects rather than misrepresents the facts alleged. For the same reason, Lutz's omission to say the amendments "were prudent to protect the Company or its stockholders" [p 22] cannot be a fraud on the shareholders.
 
 
 66
 Finally, Lewis' class action allegation at p 7(d)(ii) alleges that "in order to insulate themselves from personal liability for their breaches of fiduciary duty ... [Chrysler's board members] issue[d] and disseminate[d] false and misleading proxy materials all in violation of Section 14(a) of the Exchange Act." This conclusory allegation of a § 14(a) violation does not state with particularity exactly how the proxy materials were false and misleading. Accordingly, this general allegation does not satisfy Fed.R.Civ.P. 9(b) pleading requirement that omissions or misrepresentations of material fact actionable under the securities laws be pleaded with particularity.
 
 VII.
 Conclusion
 
 67
 We will affirm both the district court's denial of appellant's motion for reconsideration, and the grant of appellee's motion to dismiss.
 
 
 
 [1]
 The facts described are those alleged in appellant's amended complaint. Paragraph citations in this section are references to that complaint. In reviewing dismissals under Rule 12 we must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988)
 
 
 [2]
 A "poison pill"
 refers generally to preferred stock, rights, warrants, options, or debt instruments that an actual or potential target company distributes to its security holders. These instruments are designed to deter nonnegotiated takeovers by conferring certain rights on shareholders upon the occurrence of a "triggering event," such as a tender offer or third party acquisition of a specified percentage of stock. A flip-in right is a right to acquire stock of the target; a flip-over right is a right to acquire stock of the offeror. These rights usually have little value until the triggering event occurs, but may subsequently become quite expensive for any party to redeem or purchase.
 Louis Loss & Joel Seligman, 5 Securities Regulation 2148 (3d ed.1990).
 
 
 [3]
 Section 242 confers broad powers on a corporation's board of directors to amend the corporation's certificate of incorporation following initial incorporation. The third count of the Amended Complaint alleges that Chrysler's adoption of the amendments to the Plan violated provisions of the Delaware statute
 
 
 [4]
 See Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 348 (3d Cir.1986) (standard of review for denial of a motion for reconsideration varies with the nature of the underlying judicial decision); Koshatka v. Philadelphia Newspapers, Inc., 762 F.2d 329, 333 (3d Cir.1985) (appropriate standard of review of denial of motion to reconsider is plenary if the court's denial was based upon the interpretation or application of a legal precept)
 
 
 [5]
 We will assume for purposes of this review, but without deciding that Lewis and her class are "purchasers" within the meaning of the statute and the rule
 
 
 [6]
 Rule 9(b) provides:
 In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
 The Rule insures that defendants are put on notice of the precise misconduct with which they are charged, so as to safeguard against spurious charges of fraud. See generally Craftmatic, 890 F.2d at 644-646.
 
 
 [7]
 We have reviewed all other allegations in the Amended Complaint in light of appellant's allegations as a whole, and conclude they fail to state any particular misrepresentation or omission of material fact which would satisfy the pleading requirements of § 10(b) or Rule 10b-5