GREENBERG, Circuit Judge,

dissenting.

This case raises the issue of when a law firm may be liable to third parties for misrepresentations and omissions in opinion letters written by the firm to its client. I am unable to join in the majority’s opinion because the explicit disclaimers in the opinion letters, portions of which the majority quotes, made the plaintiffs’ reliance on these letters unreasonable as a matter of law. Therefore, I would reverse the order of the district court to the extent that it denied the firm summary judgment, would affirm the order to the extent that it granted the firm summary judgment, and would remand the matter for entry of summary judgment in favor of the firm against the plaintiffs on the claims involved on this appeal. My dissent addresses only the reasonable reliance issue as described on pages 14 through 19 of the typescript of the majority opinion and the accompanying footnotes, as in my view that issue is dispositive.,
As germane on this appeal, the plaintiffs alleged that the law firm, Arvey, violated section 10(b) of the Securities Exchange Act of 1934,15 U.S.C. § 78(j), and Rule 10b-5,17 C.F.R. § 240.10b-5. The plaintiffs focus their attack on Arvey on the factual descriptions of First Western’s program contained in Arvey’s opinion letters. The plaintiffs contend that these descriptions are inaccurate as a result of both misrepresentations and omissions. They further allege that as a consequence of Arvey’s misrepresentations and omissions, they suffered adverse tax consequences upon the cancellation of losing forward contracts because the Internal Revenue Service disallowed the deductions they claimed based on these losses. Indeed, the relationship of the plaintiffs’ claims to the tax portions of Arvey’s opinions is demonstrated by the district court’s holding of this case on its suspense calendar pending the outcome of litigation in the Tax Court regarding deductions for losses upon the cancellation of losing forward contracts arranged by First Western. The district court activated this case after the taxpayers were unsuccessful in that forum. See Freytag v. Comm’r, 89 T.C. 849, 1987 WL 45307 (1987), aff'd, 904 F.2d 1011 (5th Cir.1990), aff'd, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).[1] The plaintiffs, however, were not parties to that Tax Court case. Instead, they settled their cases with the Internal Revenue Service.
Arvey responds to the plaintiffs’ charges by urging that the plaintiffs could not have relied justifiably on the opinion letters, as the letters: (1) explicitly addressed assumed facts; (2) stated that these facts had been provided by the client; and (3) stated that the firm furnished the opinion to First Western and it should not be relied upon by persons other than First Western. Thus, Arvey argues that the district court erred in concluding that the qualifying language in the opinion letters did not shield it from liability as a matter of law. I agree.
I recognize that it is well settled that projections, forecasts, and opinions may be actionable under Rule 10b-5 if the declarant makes them without a genuine belief in their validity or a reasonable basis to believe in their accuracy. In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368, (3d Cir.1993), cert. denied, - U.S.-, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); Herskowitz v. *493 Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir.1988), cert. denied, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989); Eisenberg v. Gagnon, 766 F.2d 770, 775-76 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). As we explained in Eisenberg, “[a]n opinion must not be made “with reckless disregard for its truth or falsity[1] or with a lack of a ‘genuine belief that the information disclosed was accurate and complete in all material respects.’ ” 766 F.2d at 776 (citation omitted). Attorneys and other professionals are not exempt from this requirement, and courts have permitted the imposition of liability for securities fraud on professionals who knowingly or recklessly have issued false or misleading opinions. See, e.g., Id.; Duke v. Touche Ross & Co., 765 F.Supp. 69 (S.D.N.Y.1991); Stevens v. Equidyne Extractive Indus., 694 F.Supp. 1057 (S.D.N.Y.1988).
To state a violation of section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant made (1) a misstatement or an omission (2) of material fact (3) with scienter (4) on which the plaintiff relied (5) and which proximately caused the plaintiffs injury. See, e.g., Hayes v. Gross, 982 F.2d 104, 106 (3d Cir.1992); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 (3d Cir.), cert. denied, - U.S. -, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); Lewis v. Chrysler Corp., 949 F.2d 644, 649 (3d Cir.1991); Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir.1976). Moreover, the plaintiffs reliance on the alleged misstatement or omission must be reasonable, even though the defendant has the burden of proof to show it was not reasonable. Straub, 540 F.2d at 598. Consequently we have stated that to recover under section 10(b) and Rule 10b-5, “the plaintiff [must] act reasonably” and that “a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced.” Id. (emphasis added). Thus, “an investor cannot close his eyes to a known risk” and if he is “cognizant of the risk, then there is no liability.” Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir.1985). Accordingly, a securities action defendant may obtain summary judgment by demonstrating that the plaintiffs reliance on the defendant’s statements was unreasonable as a matter of law.
It stands to reason that where opinion letters regarding a potential investment— even those prepared with scienter — “bespeak caution,” reasonable investors should not rely on the representations in them. See Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir.1986). The majority concedes that “[m]ere reliance on the legal conclusions expressed in the opinion letters, without more, would have been unreasonable,” but states that it was not unreasonable for plaintiffs to rely on Arvey’s descriptions of First Western’s trading program although Arvey specifically attributed them to First Western and did not purport to have verified them. Maj. op. at 488-89. Thus, the majority holds that the “bespeaks caution” doctrine applies only “to the extent that plaintiffs relied solely and without further investigation or consideration on the opinion letters’ conclusions as to the tax consequences of the First Western transactions” because the language in the letters would not have alerted plaintiffs that Arvey knew or had reason to know that the descriptions were inaccurate. Id. at 489-90. The majority’s suggestion that the plaintiffs could reasonably rely on Arvey’s opinion letter because “Arvey’s statement that its opinion was based on facts represented to it by First Western ... contained the implicit assertion that Arvey did not know the facts to be otherwise” improperly equates scienter with reasonable reliance. Id. at 489-90. These requirements are two independent elements which must be alleged to state a primary violation of section 10(b) and Rule 10b-5.
Consequently, warnings and disclaimers— by limiting the extent to which an investor can rely on the offering documents — will preclude recovery for securities fraud even when the defendant’s scienter has been established. “Dismissal of securities fraud claims may be appropriate where the offering documents specifically warn plaintiffs not to rely on the alleged misrepresentations made by defendants, thus making any subsequent reliance unjustified.” Griffin v. McNiff, 744 F.Supp. 1237, 1253 (S.D.N.Y.1990), aff'd, 996 F.2d 303 (2d Cir.1993) (table). For this rea *494 son, several courts have dismissed cases similar to this one on the ground that it was unreasonable for the investor to have relied on representations in the challenged opinion letter in the face of the letter’s broad disclaimers or its attribution of the facts it recites to a third party.
For example in Buford White Lumber Co. v. Octagon Properties, Ltd., 740 F.Supp. 1553 (W.D.Okla.1989), the plaintiffs brought a .securities fraud suit against the law firm that had prepared the offering memorandum for the limited partnerships in which they had invested. The memorandum stated that the principals of the limited partnership and not the law firm had prepared the historical and financial statements and that the firm had not audited these statements. 740 F.Supp. at 1561. Accordingly, the court held that
[i]n the face of these disclaimers and disclosure of the limited undertaking of defendant with respect to information or matters disclosed in the offering memorandum, it would be unforeseeable as a matter of law to a prudent law firm in Defendant’s position that potential purchasers, including Plaintiffs, would rely upon Defendant’s nondisclosure of any misrepresentations or omissions in the financial statements of [the limited partnership] as a representation by Defendant that the statements were accurate by reason of which Plaintiffs might be harmed_The Offering memorandum states that the financial statements were prepared by and were the sole responsibility of [the limited partnership]. In short, Defendant did not undertake to prepare, evaluate the accuracy of, or opine upon the accuracy of financial statements by [the limited partnership] and said so.
740 F.Supp. at 1563. The court then went on to explain:
[i]n the face of the statements in the Offering Memorandum that the financial statements were the sole responsibility of [the limited partnership] and were unaudited, and disclosures concerning the limited role of Defendant in preparing or evaluating statements made in the Offering Memorandum, the Court agrees with Defendant that any reliance by Plaintiffs on Defendant’s duty to disclose inaccuracies, misrepresentation or omissions of [the limited partnership] in information it supplied is unreasonable as a matter of law.
Id. at 1566.
Numerous other courts have reached similar decisions. See, e.g., Moorhead v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243 (8th Cir.1991) (holding that bond purchasers could not maintain securities fraud action against consultant that filed a feasibility study despite alleged misrepresentations, where study contained detailed cautionary language and specific warnings of risk factors, along with underlying factual assumptions); Luce v. Edelstein, 802 F.2d at 56 (“we are not inclined to impose liability on the basis of statements that clearly ‘bespeak caution’ ” where offering memorandum warned investors that projections of potential cash and tax benefits were “ ‘necessarily speculative’”) (citation omitted); Friedman v. Arizona World Nurseries Ltd. Partnership, 730 F.Supp. 521, 541 (S.D.N.Y.1990) (dismissing section 10(b) claims on ground that plaintiffs’ reliance was unreasonable, where accountant’s tax opinion stated that the projections contained therein were based on representations which were made to the accountants by the promoter of the limited partnership), affd, 927 F.2d 594 (2d Cir.1991) (table); O’Brien v. National Property Analysts Partners, 719 F.Supp. 222, 227-29 (S.D.N.Y.1989) (holding that no liability attaches where accountant specifically attributes its financial assumptions to documents given to it by representatives of the limited partnership); Stevens v. Equidyne Extractive Indus., 694 F.Supp. at 1063-64 (dismissing securities fraud suit against accountant, because statements in accountant’s opinion letter “set forth that they [were] based on supplied facts, [and] additionally state[d] that there is no implication that the results predicted can or will be achieved”); Feinman v. Shulman Berlin & Davis, 677 F.Supp. 168, 170-71 (S.D.N.Y.1988) (holding that where “offering memorandum warned plaintiffs not to rely on the misrepresentations which the defendants allegedly made [,] plaintiffs’ reliance on those misrepresentations, if made was unjustified and dismissal is appropri *495 ate”)[2]; Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 651 F.Supp. 877, 881 (D.Conn.1986) (dismissing section 10(b) claims because the cautionary “language of the document in question limited the degree to which investors should rely on it” as it told investors that defendant accounting firm did not verify the data upon which its projections were based); Devaney v. Chester, Fed.Sec.L.Rep. (CCH) ¶ 92,747, at 93,649 (S.D.N.Y.1986), rev’d on other grounds, 813 F.2d 566, 569 (2d Cir.1987) (dismissing securities fraud claim against investment bank because the confidential memorandum it prepared “with its broad disclaimers as to the source of information contained therein, does not support an allegation of reliance. Investors would not be likely to rely on memoranda which so definitely stated their dependency on another source”).[3]
Like the law firm in Buford White Lumber Co., Arvey made it clear that it did not undertake to guarantee to potential investors the accuracy of the factual information contained in its letters. Arvey also made it clear that it was not offering advice to such investors. Each of the opinion letters is addressed to Sidney Samuels as president of First Western, and is stated to be for the exclusive use of Samuels or First Western. The 1980 opinion letter emphasizes this point most strongly. It warns that it “supersedes our letter of June 8,1979, upon which, as you were previously informed, you should no longer rely,” App. at 576, and contains an even more forceful cautionary statement than the earlier letters that:
[t]his letter is intended solely for the internal use of First Western and, accordingly, it is not intended to be, and should not be, relied upon by any person other than First Western. Further, this letter is not to be quoted or otherwise referred to in any documents, including financial statements of First Western, nor is it to be filed with or furnished to any governmental agency or other person without the express prior written consent of this firm.
Id. at 590-91.
Furthermore, the opinion letters were replete with cautionary language. All three warned that the IRS and the courts might “take a strong stance contrary to the opinion expressed herein.” Id. at 147 (1978 letter), 574 (1979 letter), 591 (1980 letter).[4] Indeed, the 1980 opinion letter disclosed that the IRS was investigating First Western’s customers for engaging in tax avoidance transactions and that the IRS generally viewed the simultaneous holding and selling of forward contracts with suspicion. The letter stated that:
Rev.Rul. 77-185 is part of a concerted effort by the Service to curb what it considers the abusive use of offsetting positions in securities and commodities to minimize or defer tax liability. In addition to promulgating Rev.Rul. 77-185, the Service has added Chapter 700 (‘Commodity Options and Futures’) to its Tax Shelters Examination Handbook, in which it identifies, among other transactions, ‘the simultaneous buying and selling of futures contracts in ... GNMA Certificates’ as a ‘basic tax shelter arrangement.’ The Service has also announced a policy of identifying for audit returns which contain significant securities and commodities transactions, and is presently litigating various cases involving transactions similar to those involved in Rev.Rul. 77-185. Due to the Service’s concern with transactions similar to those entered into between First Western and its customers, persons who enter into transactions with First Western may substantially increase their chances of being audited by the Service. Further, you *496 have informed us that customers of First Western are being audited by the Service and that the Service has questioned the deductibility of losses realized by such customers on the basis of the theory set forth by the Service in Rev.Rul. 77-185.
App. at 588 (emphasis added). This warning, in no uncertain terms, put potential investors who read Arvey’s letters, including the plaintiffs, on notice of the strong possibility that the IRS would disallow deductions by investors of any losses resulting from the cancellation of First Western contracts on the ground that the transactions were really only a tax avoidance scheme. Of course, that is exactly what happened. Furthermore, the 1980 letter disclosed First Western’s troubled past by discussing the IRS’s audits of prior First Western transactions identical to those analyzed in the opinion letters. Thus, the plaintiffs cannot state a claim of misrepresentation because the facts upon which their claim is premised were disclosed clearly. “[T]he naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.” Spie-gler v. Wills, 60 F.R.D. 681, 683 (S.D.N.Y.1973).[5] Furthermore, in the face of this disclosure, it was unreasonable for the plaintiffs to rely on the Arvey letters as support for the validity of deductions for ordinary losses upon the cancellation of a losing forward contract.
In addition to warning of the possible non-deductibility of losses resulting from the purchase of First Western’s forward contracts, the opinion letters clearly indicated that they depended on assumed facts. In this regard, the letters prefaced their factual description of First Western’s trading programs with the following introductory remarks, attributing the descriptions to Samuels: “the following paragraphs contain a summary of such transactions as you have described them to us,” App. at 135 (1978 letter); “you have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to such transactions,” Id. at 558 (1979 letter); and “you have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to the transactions between First Western and its customers, and that no material fact necessary to make the information herein not false or misleading has been omitted,” Id. at 576 (1980 letter).
Furthermore, almost every specific factual description of how the First Western trading program functioned began with the phrase “you have represented to us ...” or the equivalent. For example, both the 1979 and 1980 letters included the following statements:
you have represented to us that the various combinations of forward contracts obligating the customer to deliver and take delivery of money market instruments will, as described above, have sufficiently different stated interest rates and delivery dates so as to produce independent price movement among such contracts and cause the customer to have a reasonable opportunity of realizing economic gain (and a corresponding risk of loss) with respect to his various positions[6]
Id. at 560-61, 577 (1979 and 1980 letters).
You have represented to us that the transactions entered into by First Western and its customers will reflect the customer’s market strategy and interest rate forecast, will have economic validity independent of their respective tax consequences, and will produce a reasonable opportunity for economic gain and risk of economic loss.
Id. at 573 (emphasis added) (1979 letter).
In addition, this opinion is subject to the consummation of the transactions between First Western and its customers pursuant to the facts and conditions described above *497 and is further expressly conditioned on your representation that such transactions will be consummated by the customers of First Western with a reasonable expectation of economic gain.
Id. at 563 (emphasis added) (1979 letter).
Thus, Arvey’s opinion letters, like those in the above cited cases, expressly noted that Samuels and First Western, not Arvey, supplied the facts, that even under those facts there was no guarantee that the results predicted would be achieved, and that the letters should not be relied upon by the investors. Given all of this cautionary language, the plaintiffs should not have understood the opinion letters to mean that Arvey had made factual representations regarding First Western’s programs. I would therefore hold that the plaintiffs’ could not have relied reasonably on the opinion letters as to the accuracy of the factual descriptions they contain, or indeed anything else, and thus no liability may be imposed on Arvey.
I have demonstrated already that the plaintiffs’ reliance on the opinion letters was unreasonable. But there is even more evidence to support this conclusion, as the 1980 letter also includes a veritable bugle blast of an announcement cautioning investors not to rely on Arvey’s opinion:
[h]owever, as discussed in more detail below, the deductibility of any particular customer’s losses may depend upon certain facts and circumstances related to such customer’s account with First Western at the time the loss is incurred. Accordingly, it is impossible for us to express an opinion as to the deductibility of any particular loss incurred by a customer of First Western.
Id. at 586 (emphasis added). In view of the foregoing statement, the plaintiffs’ reliance on Arvey’s letters was not simply unreasonable. It was reckless. I believe that it is absolutely clear that the plaintiffs could not have relied reasonably on an opinion letter to justify tax deductions when the letter indicates that “it is impossible for us to express an opinion as to the deductibility of any particular loss incurred by a customer of First Western.”
An examination of the factors which we said in Straub should be considered when determining whether a plaintiff justifiably relied on the defendant’s misrepresentations reinforces my conclusion, though I hasten to add that it is so obvious that the plaintiffs’ reliance on Arvey’s letters was unreasonable that I could stop my dissent at this point. 540 F.2d at 598. But I will go on. There are five Straub factors: (1) the existence of a fiduciary relationship; (2) the plaintiffs’ opportunity to detect the fraud; (8) the sophistication of the plaintiffs; (4) the existence of a longstanding business or personal relationship; and (5) access to the relevant information. Id. In regard to the first and fourth factors, Arvey clearly had no special relationship with the plaintiffs that would give the plaintiffs any grounds to trust Arvey’s representations or that would impose on Arvey any duty to inform the plaintiffs of possible inaccuracies. Indeed, the majority acknowledges this point. See maj. op. at 488.
As to the other factors, we must remember that we are not dealing with plaintiffs who made conventional investments. Straddle transactions are not designed for the proverbial “person on the street.” To the contrary, the transactions discussed in the opinion letters involved very complex financial arrangements meant for sophisticated investors looking for tax advantages. The mere fact that these transactions were on the cutting edge of strategic tax planning should have put any reasonable investor on notice that there was a substantial risk of tax complications. Furthermore, the various disclosures in the letters should have provided the plaintiffs with the incentive and opportunity to detect possible fraud. As I explain above, the letters not only made it clear that they were predicated on facts provided by Samuels, and not verified by Arvey, but they also disclosed past instances in which the TRS questioned the validity of transactions identical to those discussed in the letters, and indicated that it was likely there would be future trouble as well. Thus, the letters gave the plaintiffs every incentive to make further inquiries into the legitimacy of the First Western program and should have caused them to withhold their investments until they had the informa *498 tion necessary to make informed decisions. In sum, the application of the Straub factors dictates the conclusion that an investor could not justifiably rely on the representations contained in Arvey’s opinion letters.
In rejecting this conclusion, the majority writes that there is no evidence that these plaintiffs had any particular knowledge or sophistication which,would enable them to notice any irregularities in First Western’s programs. Id. at 488. The majority notes further that reliance on the letters might be justified because an investor could take the letters to an attorney and, predicated on the facts in them, obtain an erroneous opinion. Id. at 488.
But the opinion letters made it clear that the facts they contained originated from First Western, not Arvey. Although another attorney might have agreed with the legal analysis in the opinion letters, there is no way that another attorney could have confirmed from the letters themselves that the facts underlying the opinions were correct as the facts were solely within the knowledge of First Western. Any reasonable person reading the letters would have realized this and questioned the reliability of the factual descriptions of First Western’s trading practices and, in particular, the statements regarding the independent economic validity of the transactions. Furthermore, as I noted above, the 1980 opinion letter states that investors are not to make an investment decision based on the letter, but if they do, they should at least obtain written permission from Arvey. This admonishment should have pounded home to the plaintiffs the risk that they were taking.
I emphasize that it is critically important to focus on the precise nature of the plaintiffs’ claims, because the reasonableness of the plaintiffs’ reliance cannot be considered in the abstract. The precise issue is whether the plaintiffs could rely reasonably on the letters in considering the tax consequences of canceling a forward contract. As the plaintiffs explain in their opening brief at 5, “[t]he focus of each opinion letter was the federal income tax treatment of a loss sustained by a First Western customer upon the cancellation of a losing forward contract (a ‘loss contract’) prior to the contract’s settlement date.” In particular, the plaintiffs claim that Arvey mislead them because its opinion letters said that they would have ordinary losses when canceling losing forward contracts.[7]
In the face of this claim, I ask the rhetorical question: how can an investor reasonably rely on opinion letters to anticipate favorable tax treatment when they: (1) are addressed to someone else; (2) are by their terms only for the use of someone else; (3) by their terms cannot be shown to the investor; (4) are predicated on facts not supplied by the author of the letters; (5) warn that the IRS likely will challenge the claim for favorable treatment as it has in similar situations; (6) explain the basis for the challenge; (7) state that the courts might take a strong stance contrary to the opinion; and (8) flatly announce that it is “impossible” for the author of the letter “to express an opinion as to the deductibility of any particular loss incurred by” an investor? The answer is obvious. The investors could not rely reasonably on such letters, and thus Arvey is entitled to summary judgment on the Section 10(b) claims.[8] In my view, nothing could be clearer.
Surely if there ever was any doubt as to Arvey’s right to a summary judgment, it did *499 not survive our recent opinion in In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357. In Trump, as in this ease, the plaintiffs asserted a Section 10(b) action.[9] The action arose from the sale of bonds by the defendants to acquire, complete the construction of, and open a gigantic casino in Atlantic City, New Jersey. The plaintiffs were purchasers of the bonds who claimed that in making their purchases they relied on false statements in the prospectus. The plaintiffs also asserted that material matters were omitted from the prospectus. The defendants successfully moved to dismiss under Fed.R.Civ.P. 12(b)(6), as the complaint failed to state a claim on which relief could be granted.
On appeal we affirmed on the basis of the “bespeaks caution” doctrine. We pointed out that the prospectus was so filled with cautionary language that the allegedly misleading statements became immaterial as a matter of law. Trump, 7 F.3d at 371-73. I will not set forth the representations and cautionary language in Trump, for I see no need to do so. Rather, I indicate only that it seems obvious that the facts in Trump gave the investors a stronger claim for recovery than the facts in this ease give the plaintiffs here. Yet in Trump we affirmed the order of the district court granting the defendants judgment under Rule 12(b)(6).
I acknowledge that in Trump we held that the cautionary language rendered the alleged misrepresentation immaterial as a matter of law while here we are concerned with whether the plaintiffs reasonably relied on Arvey’s opinion letters. But this distinction makes no difference. The point is that the cautionary language in the Trump prospectus should have hammered home to the investors the risk they were taking. Precisely the same thing is true here. The plaintiffs here could not rely reasonably on documents which by their terms were not for their view and which were conditioned so thoroughly. While it is true, as the majority points out, that Arvey may have known that investors would see the letters, that knowledge is immaterial to the question of reasonable reliance, a determination that must be predicated on what should be the investor’s state of mind. Thus, I do not urge that we hold that Arvey did not misrepresent.[10] Rather, I would hold Arvey has demonstrated that the plaintiffs unreasonably relied on its opinion letters.
By its holding that there is a triable issue as to whether the plaintiffs’ reliance on the Arvey letters was reasonable, the majority effectively holds that no matter how thoroughly a law firm conditions its opinion, it may be liable to the investors in a Section 10(b) action for misrepresentation and omissions. In this circuit there now will be no safe harbor for attorneys in the sea of Section 10(b) cases. The majority’s holding thus cannot be reconciled with the warnings, recently made by the Court of Appeals for the Fourth Circuit, that where, as here, a law firm has “unequivocally informed potential investors that the law firm had not verified the financial data provided to it by the client[,] ... [t]o find a duty in the face of this express disclaimer of verification would render law firms powerless to define the scope of their involvement in commercial transactions.” See Fortson v. Winstead, McGuire, Sechrest, & Minick, 961 F.2d 469, 475 (4th Cir.1992). I cannot conceive of more explicit disclaimers than Arvey’s. If such disclaimers cannot permit a law firm to foreclose the possibility of imposition of liability on it to outside parties for issuing a written opinion to a client, then nothing will. The result of the majority’s position is therefore “a rigid rule charging all attorneys who involve themselves in any narrow corner of a commercial transaction with responsibility for the whole transaction” even when they expressly disclaim any such involvement. Id.
Furthermore, as a practical matter, the majority opinion has eliminated the justifiable reliance element oí Section 10(b) actions which hereafter in this circuit will exist only *500 in theory. The opinion will have far-reaching consequences in this circuit and perhaps beyond because in our national economy attorneys anywhere may recognize that in some securities transactions litigation in this circuit may materialize. The opinion should lead knowledgeable commercial attorneys in situations in which the Securities Exchange Act may become implicated to be reluctant to advise anyone about anything which could affect the rights of investors or the value of the securities. Indeed, I see no principled way to limit the majority’s decision to opinions given by attorneys. Accordingly, I dissent.

. The Supreme Court did not deal with the merits of the controversy. The opinion of the Court of Appeals contains a succinct description of the First Western program. 904 F.2d at 1013-14.

. In my view, Friedman and Feinman are particularly significant because they dealt with caveats concerning the tax consequences of the transactions and, as here, warned that the IRS might challenge the tax assumptions underlying the investments.

. The Court of Appeals for the Second Circuit reversed the district court's judgment on the ground that the court should have permitted the plaintiffs to file an amended complaint. This holding, however, did not cast doubt on the district court's determination that reliance is unjustified where the document at issue contains cautionary language and represents that the source of the information contained therein came from a third party.

. The plaintiffs made their investments in December 1980 after they read Arvey's 1979 and 1980 letters.

. The cases I have cited do not always distinguish among the related concepts that a statement may be so conditioned that: (1) it cannot be regarded as misleading; (2) the representations it contains may not be material; and (3) reliance on the statement may be unreasonable. Nevertheless all support the conclusion that the plaintiffs' reliance in this case was unreasonable.

. The words which I have underscored read as follows in the 1980 letter: “with respect to his overall position.”

. Actually, it never has been established that this advice was wrong. While the Tax Court ruled against other investors in the First Western program, and its decisions were affirmed on the merits by the Court of Appeals for the Fifth Circuit, the plaintiffs were not parties to that case. For all that we know, it is possible that if the plaintiffs had not chosen to settle with the IRS, they might have prevailed in litigation in either the Tax Court or in a different court of appeals. Courts of appeals, after all, do not always view identical tax issues similarly. See Pleasant Summit Land Corp. v. Comm'r., 863 F.2d 263, 265 n. 2. (3d Cir.1988), cert. denied, 493 U.S. 901, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989). I acknowledge, however, that probably the plaintiffs would have lost and I further recognize that the Preytag case was a "test case.” Preytag, 904 F.2d at 1014. Of course, my opinion is not dependent on whether Arvey's opinion was right or wrong.

. Of course, there is no dispute of fact precluding summary judgment, as the plaintiffs do not contend that the opinion letters do not contain the provisions I have quoted.

. Trump also involved other counts which we need not describe.

. Of course, on the basis of Trump and the other opinions I have cited, we could hold that there were no misrepresentations, but even if there were, they were not material. But I am not taking that approach.