Anthony M. WEIKEL, et al., Plaintiffs,

v.

TOWER SEMICONDUCTOR LTD., et al., Defendants.

No. CIV. A. 96–3711 (AJL).

United States District Court,
D. New Jersey.

Oct. 20, 1998.

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ, Liaison Counsel for Plaintiffs.

Steven G. Schulman, Salvatore J. Graziano, Milberg, Weis, Bershad Hynes & Lerach, New York City, Lead Counsel for Plaintiffs.

Richard Bemporad, Sherrie Brown, Lowey, Dannenberg, Bemporad & Selinger, White Plains, NY, Susan Salvetti, Joseph S. Tusa, Zwerling, Schachter & Zwerling, Daniel W. Krasner, David A.P. Brower, Wolf, Haldenstein, Adler, Freeman & Herz, Jules Brody, Stull, Stull & Brody, New York City, Executive Committee for Plaintiffs.

Kevin J. Yourman, James Tullman, Weiss & Yourman, Los Angeles, CA, Richard S. Wayne, William K. Flynn, Strauss & Troy, Cincinnati, OH, Marvin Schiff, R. Eric Kennedy, Weisman, Goldberg & Weisman, Cleveland, OH, Jeffrey H. Squire, Ira M. Press, Kaufman, Malchman, Kirby & Squire, New York City, Counsel for Plaintiffs.

Robert J. DelTufo, Skadden, Arps, Slate, Meagher & Flom, Newark, NJ, Jay B. Kasner, Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom, New York City, Counsel for Defendants.

## OPINION

LECHNER, District Judge.

This case is an action brought by Anthony M. Weikel ("Weikel"), Helene Carroll ("Carroll"), Elie Wurtman ("Wurtman"), Alex Meruelo ("Meruelo"), and David A. Lyons ("Lyons") (collectively, the "Lead Plaintiffs")[1] on behalf of purchasers (the "Class") of certain stock and call options[2] for Tower Semiconductor, Inc. ("Tower") during the period beginning 25 May 1995 and ending 10 June 1996 (the "Class Period"). Lead Plaintiffs allege Tower, Data Systems & Software Inc. ("DSSI"), and George Morgenstern ("Morgenstern"), Rafael M. Levin ("Levin"), and Yoav Nissan–Cohen ("Nissan–Cohen") (the "Individual Defendants") (collectively, the "Defendants") created and sustained the false impression Tower would continue on its course of growth and profitability.

Lead Plaintiffs seek to recover losses resulting from the alleged misconduct of the Defendants pursuant to Section 10(b) ("Section 10(b)"), as amended 15 U.S.C. § 78j(b), of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 ("Rule 10b–5") of the Securities and Exchange Commission

---

1. This matter was transferred from the Honorable John W. Bissell, U.S.D.J. to the undersigned.

Before this matter was transferred, Weikel, Carroll, Wurtman, Meruelo, Lyons, Barbara I. Hill ("Hill"), Harvey Ostrager ("Ostrager"), Ronald Putnam ("Putnam"), and Kenneth M. Wurtman ("K.Wurtman") were designated Lead Plaintiffs by Judge Bissell. *See* 8 November 1996 Order (appointing lead plaintiffs and consolidating this action). Hill, Ostrager, Putnam, and K. Wurtman are not seeking certification as class representatives, without prejudice to their later seeking certification should the need arise. *See* Moving Brief at 2 n. 1.

2. A call option is a contract which gives its owner the right to buy a specified number of shares of the underlying stock at a price set in the contract at a time on or before the expiration date of the contract. *See Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir.1988). A premium is paid for the option; the contract is worth more or less than the premium depending upon the direction of the market price of the underlying stock relative to the purchase price set in the contract. *See id.*

("SEC"), 17 C.F.R. § 240.10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t (collectively, the "Exchange Act Claims"). Plaintiffs also allege liability based upon the common law tort of negligent misrepresentation.

Presently pending is the motion of the Lead Plaintiffs for class certification (the "Motion for Class Certification").[3] For the reasons stated below, Wurtman, Lyons and Carroll are certified as class representatives. Weikel and Meruelo, however, are found not to be proper class representatives. The Class shall consist of all purchasers of Tower securities during the class period seeking recovery pursuant to the Exchange Act. The Motion for Class Certification is denied as it pertains to the pendent state law misrepresentation claims.

*Facts*

A. *The Lead Plaintiffs*

Weikel purchased 38,600 shares of Tower stock ("Tower Ordinary Shares") during the Class Period. *See* Complaint Schedule A at ¶ 1. These purchases were made between 16 January 1996 and 2 May 1996. *See id.* The purchase prices ranged from a low of $13 ¾ per share on 22 March 1996 and a high of $23¾ per share on 6 February 1996. *See id.*

Carroll purchased two thousand Tower Ordinary Shares during the Class Period. *See* Complaint Schedule A at ¶ 5. These shares were purchased on 7 May 1996 at a price of $14¼ per share. *See id.*

Wurtman purchased six hundred Tower Ordinary Shares during the Class Period. *See* Complaint Schedule A at ¶ 6. These shares were purchased between 7 November 1995 and 15 March 1996. *See id.* The purchase prices ranged from a low of $13½ per share on 15 March 1996 to a high of $28⅝ per share on 7 November 1995. *See id.*

Meruelo purchased 206,450 Tower Ordinary Shares during the Class Period. *See* Complaint Schedule A at ¶ 7. These shares were purchased between 31 May 1995 and 25 October 1995. *See id.* The purchase prices ranged from a low of $21⅞ per share on 31 May 1995 to a high of $32⅜ per share on 22 August 1995. *See id.* In addition, Meruelo purchased European call options[4] for Tower stock (the "Euro Options") on 29 September 1995. *See id.* Meruelo purchased 950 Euro Options at $10.50 per option. *See id.* Each Euro Option gave Meruelo the right to purchase one hundred shares of Tower stock at the price set in the option contract. *See id.*

Lyons purchased five hundred Tower Ordinary Shares during the Class Period. *See* Complaint Schedule A at ¶ 10. These shares were purchased on 22 May 1996 at a price of $14¾ per share. *See id.*

B. *Background*

1. *Tower and the Market for Tower Securities*

Tower is a corporation organized under the laws of Israel. *See* Complaint ¶ 11(a). Tower is the manufacturer of semiconductor inte-

---

3. In support of the Motion for Class Certification, Lead Plaintiffs submitted:
 - Lead Plaintiffs' Memorandum of Law in Support of Their Motion For Class Certification ("Moving Brief") with attached exhibits;
 - Lead Plaintiff's Reply Memorandum in Support of Class Certification ("Reply Brief");
 - Affidavit of Steven G. Schulman in Support of Lead Plaintiffs' Motion for Class Certification with attached exhibits ("Schulman Aff.");
 - Lead Plaintiffs' List of Defined Terms in Connection with Their Motion For Class Certification;
 - Lead Plaintiffs' Supplemental List of Defined Terms in Connection with Their Motion for Class Certification.
 In opposition to the Motion for Class Certification, Defendants submitted:
 - Memorandum of Law in Opposition to Five Plaintiffs' Motion for Class Certification;
 - Appendix of Unreported Cases Accompanying Defendants' Memorandum of Law in Opposition to Five Plaintiffs' Motion for Class Certification;
 - Declarations of Robert J. Del Tufo, Andrew S. Carron, Ph.D. and Professor Israel Gilead in Opposition to Five Plaintiffs' Motion for Class Certification with attached exhibits;
 - Defendants' List of Defined Terms in Connection with Their Memorandum of Law in Opposition to Five Plaintiffs' Motion for Class Certification.

4. European options are distinct from American options. European options can only be exercised by the purchaser at maturity. *See* Saunders Aff. at 2. American options, by contrast, can be exercised at any time prior to maturity. *See id.*

grated circuits ("ICs") on silicon wafers. *See id.* ¶ 11(b). ICs manufactured by Tower are incorporated into products such as computer and office equipment, communication products and consumer electronics. *See id.* Lead Plaintiffs allege Tower was dependent upon three key customers for a significant portion of its business—National Semiconductor Corporation ("National Semiconductor"), Hewlett–Packard ("H–P"), and Motorola, Inc. ("Motorola"). *See id.* ¶ 11(c).

At all relevant times, Tower Ordinary Shares were traded on the NASDAQ National Market System under the symbol "TSEMF."[5] *See* Complaint ¶ 11(e). The trading volume for Tower stock, during the Class Period, averaged 100,000 shares per day. *See id.* ¶ 27(c). Tower was followed, and reported on, by major brokerage firms. *See id.* ¶ 27(e). These reports were made available to the investing public. *See id.*

In addition, Tower regularly disseminated information through press releases on the national circuits of major newswire services and through communications with the financial press, such as Dow Jones. *See id.* Lead Plaintiffs contend "the market for Tower securities promptly digested current information regarding Tower from all publicly available sources and reflected such information in Tower's share price." *See id.* ¶ 28.

Lead Plaintiffs allege the market for Tower securities was open, well-developed and efficient at all relevant times. *See* Complaint ¶ 11(e). As of July 1995, Tower had more than thirteen million ordinary shares issued and outstanding. *See id.* ¶ 11(f).

Tower was established as a joint venture of DSSI and National Semiconductor in March of 1993. *See* Complaint ¶ 12(d). DSSI is a corporation organized under the laws of Delaware with its principal executive offices in Mahwah, New Jersey. *See id.* ¶ 12(a). Lead Plaintiffs allege DSSI retained effective control over Tower at all relevant times. *See id.* ¶ 12(d).

Lead Plaintiffs allege, that as a result of the controlling interest DSSI held in Tower, DSSI executive personnel had access to adverse undisclosed information concerning the business of Tower. *See* Complaint ¶ 12(g). Lead Plaintiffs further allege DSSI and the Individual Defendants "were able to and did control the content of various financial reports, press releases, presentations to securities analysts and other public statements pertaining to [Tower]." *See id.* ¶ 20.

### 2. *The Alleged Fraud*

Lead Plaintiffs allege Tower portrayed itself as a rapidly growing semiconductor manufacturer with a secure and growing customer base. *See* Complaint ¶ 44. Lead Plaintiffs further allege this portrayal was materially false because Tower was experiencing serious problems which undermined its attainment of growth goals. *See id.* ¶ 46.

On 25 May 1995, the first day of the Class Period, Tower filed its annual report with the Securities Exchange Commission (the "SEC"). *See* Complaint ¶ 53. Beginning with this report, Lead Plaintiffs allege Defendants knowingly or recklessly participated in a fraudulent scheme to inflate the price of Tower stock. *See id.* ¶ 3. Specifically, Lead Plaintiffs focus on the relationship between Tower and H–P, one of the primary customers of Tower, and the development of a specialized 0.8 micron process. *See id.* ¶ 46(h).

Lead Plaintiffs allege the expansion plans of Tower were "materially overstated, unattainable and made without reasonable basis." *See* Complaint ¶ 46(h). Lead Plaintiffs further allege on 13 March 1996, Tower announced for the first time that "as a result of the yield problem described above, the Company had decided to reduce its capacity expansion plans going forward." *See* Complaint ¶ 96. In particular, Lead Plaintiffs allege "[D]efendants led the investment community to believe that Tower had entered into a 'strategic alliance' with one of its key customers, [H–P]." Complaint ¶ 46(a). This alliance, however, is alleged to have been contingent upon the development of a specialized 0.8 micron process created to the exacting specifications of H–P. *See id.* Lead Plaintiffs contend the troubles Tower experienced in developing this process made the technology upon which its business was

---

5. There was no trading market for Tower Ordinary Shares outside the United States. *See id.*

based increasingly outmoded and unattractive to H–P. *See id.* ¶ 46(c).

Lead Plaintiffs allege Tower experienced considerable delays in developing this process. *See* Complaint ¶ 46(c). Lead Plaintiffs further allege Defendants knew H–P would not maintain its alliance with Tower in the face of such delays. *See id.*

Yet, throughout the class period, Lead Plaintiffs contend Tower released numerous statements touting its strong customer relations, noting potential for future growth and reporting the 0.8 micron process would be developed by the third quarter of 1995. *See, e.g.,* Complaint ¶¶ 72–73 (alleging on 24 August 1995, Tower announced signing of a new three-year contract with H–P, but failed to disclose Tower had, as yet, been unable to meet the requirements of H–P concerning the 0.8 micron process); *id.* ¶¶ 81–83 (alleging Tower announced record results for the third quarter of 1995 and the first nine months of the year, but failed to disclose Tower had not met the requirements of H–P); *id.* ¶ 85 (citing letter of Morgenstern included with the 1994 Annual Report of Tower which outlined continued increases in manufacturing capacity and ongoing advancement in process technologies); *id.* ¶ 89 (Tower announced record results for the fourth quarter and twelve month period ending 31 December 1995).

On 13 March 1996, Tower announced for the first time it was experiencing difficulties in developing the 0.8 micron process (the "13 March 1996 Announcement"). *See* Complaint ¶ 96. As a result of these problems, Tower stated it had decided to reduce its future expansion plans. *See id.* Also, Tower announced it expected sales and earnings for the first quarter of 1996, and the balance of 1996 and 1997, to be below the then current expectations of analysts. *See id.*

Lead Plaintiffs allege the price of Tower Ordinary Shares dropped eighteen percent, from $16½ per share to $13½ per share, as a result of these disclosures. *See* Complaint ¶ 97.

When Tower officials were asked if there would be any effect on the relationship with H–P, they responded it would be difficult for H–P to replace Tower. *See* Complaint ¶ 98. In addition, Tower stated problems with the 0.8 micron process would be fixed in four to six weeks. *See id.* Lead Plaintiffs allege, however, Defendants were aware of more significant problems with the 0.8 micron process than were disclosed. *See id.* ¶ 99. It is alleged it would have cost many millions of dollars to correct these problems. *See id.*

On 10 June 1996, the last day of the Class period, Tower announced Tower and H–P had agreed to terminate their business relationship (the "10 June 1996 Announcement").[6] *See* Complaint ¶ 104. Tower cited the inability to achieve business goals as the reason for the termination. *See id.* On 11 June 1996, the price of Tower Ordinary Shares fell twenty-two percent from $14 per share to $10⅞ per share. *See id.* ¶ 105. Lead Plaintiffs attribute this drop in price to the 10 June 1996 Announcement. *See id.* Lead Plaintiffs allege industry experts viewed the 10 June 1996 Announcement as an "extreme reversal" from public statements made by Tower, DSSI and the Individual Defendants. *See id.*

### 3. *The Class Allegations*

Lead Plaintiffs allege, as a result of the false and misleading statements and omissions made by Tower, they and the members of the Class purchased Tower Ordinary Shares and related call options at artificially inflated prices. *See* Complaint ¶ 116. Lead Plaintiffs further allege they and other members of the class would not have purchased Tower securities during the class period had the truth been made available to them. *See id.*

Lead Plaintiffs believe there are thousands of members of the Class located throughout the United States. *See* Complaint ¶ 22. The exact number of potential members of the Class is not known. *See id.*

---

**6.** Nissan–Cohen stated the reason H–P terminated its business relationship with Tower was the failure of Tower to meet the technological needs of H–P for the specialized 0.8 micron wafers. *See* Complaint ¶ 109.

Lead Plaintiffs allege the following questions of law or fact are common to all members of the class:

(a) Whether the federal securities laws and state law were violated by Defendants' acts and omissions as alleged in the complaint;

(b) Whether the Defendants culpably participated in and pursued the common course of conduct alleged in the complaint and/or controlled other persons who committed primary violations of federal securities law;

(c) Whether documents, press releases and other statements disseminated by Defendants to the investing public and Tower shareholders during the Class Period misrepresented or omitted material facts about the business, products, sales, markets, financial condition and business prospects of Tower;

(d) Whether the market prices of Tower Ordinary Shares and related call options were artificially inflated during the Class Period Due to the material misrepresentations and failures to correct the material misrepresentations as alleged in the Complaint; and

(e) To what extent the members of the Class have sustained damages and the proper measure of those damages.

Complaint ¶ 25.

*Discussion*

### A. *Motion for Class Certification—Legal Standards*

A party bringing a motion for class certification bears the burden of demonstrating all the requirements of Rule 23 of the Federal Rules of Civil Procedure are met. *See Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir.1996); *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 72 (D.N.J.1993); *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 250 (D.N.J.1992).

A party moving for class certification must demonstrate the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure ("Rule 23(a)") are met. *See Amchem Prod-*

*ucts, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997); *PBA Local No. 38 v. Woodbridge Police Dep't*, 134 F.R.D. 96, 101 (D.N.J.1991). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Rule 23(a).

A class cannot be certified unless "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. 147, 160–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Liberty Lincoln Mercury*, 149 F.R.D. at 73; *accord Lerch*, 144 F.R.D. at 250.

The moving party must also prove the action falls within one of the three categories of Rule 23(b). *See Amchem*, 521 U.S. ——, 117 S.Ct. at 2245; *Liberty Lincoln Mercury*, 149 F.R.D. at 73; *PBA Local No. 38*, 134 F.R.D. at 101. In the instant matter, the Lead Plaintiffs move for class certification pursuant to Rule 23(b)(3). Rule 23(b)(3) provides:

> An action may be maintainable as a class action if the prerequisites of subdivision (a) are satisfied, and in addition ... the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(3).

■ While a court should not decide the merits of a case on a motion for class certification, *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), a court may analyze the essential elements of the substantive claims to determine if the requirements of Rule 23 are met.

*See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."); *Castano,* 84 F.3d at 744 ("[A] court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."); *Liberty Lincoln Mercury,* 149 F.R.D. at 73. In making this determination, a court may review the pleadings and the facts procured though discovery. *See Falcon,* 457 U.S. at 160, 102 S.Ct. 2364 ("[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Liberty Lincoln Mercury,* 149 F.R.D. at 73.

■ In the instant case, Lead Plaintiffs center the Exchange Act Claims upon violations of Rule 10b–5. Recovery under Rule 10b–5 requires proof of a false representation or an omission of a material fact, knowledge or reckless disregard of its falsity by a defendant and his or her intention plaintiff rely on the falsity, reasonable reliance thereon by the plaintiff, and a resultant loss. *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 135 F.3d 266, 269 (3d Cir.1998); *Kline v. First Western Gov't Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir. 1992) (citation omitted); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 280 (3d Cir.1992); *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991) (citation omitted); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989); *Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3d cir.1988) (citing *Peil v. Speiser,* 806 F.2d 1154, 1160 & n. 9 (3d Cir.1986) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985))).

■ The reliance of a plaintiff on alleged misstatements or omissions must be reasonable, even though the burden of proof is upon the defendant to show reliance was not reasonable. *See Kline,* 24 F.3d at 493 (citing *Straub v. Vaisman & Co.,* 540 F.2d 591, 598 (1976)). Where the security involved is traded in an open and efficient market,[7] a plaintiff need not show individual and specific reliance on the misrepresentation of a defendant. *See Hayes,* 982 F.2d at 106. A plaintiff may instead rely upon the fraud on the market theory and claim only that he or she suffered injury in the capacity of a purchaser or seller of a security in such a market. *See id.; Cammer,* 711 F.Supp. at 1276.

In *Peil,* the Circuit held a showing of a fraud on the market may result in a rebuttable presumption of reliance by a plaintiff who purchases a security in an open and developed market. *See* 806 F.2d at 1161; *see also Basic,* 485 U.S. at 246–48, 108 S.Ct. 978 (adopting the presumption of reliance pursuant to the fraud on the market theory); *Zlotnick,* 836 F.2d at 821.

■ In determining whether a particular market is open and developed, consideration should be given to the average weekly trading volume during the class period, the number of securities analysts who followed and reported on a company's stock, the number of market makers in the stock, the ability of the company to file an S–3 Registration Statement[8] in connection with public offerings, and the existence of empirical facts demonstrating a causal relationship between corporate events or financial releases and immediate responses in price. *See Cammer,* 711 F.Supp. at 1286–87.

■ Where a purchaser of a stock establishes he or she made the purchase in an "'open and developed market'" and the defendant had made a material misrepresentation, it "'will [be] presume[d]' that the mis-

---

7. "'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.'" *See Cammer v. Bloom,* 711 F.Supp. 1264, 1276 (D.N.J.1989) (quoting *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

8. Form S–3 is a short form registration statement available to certain corporations with an established history of filings with the SEC and a widespread following in the marketplace. *See Cammer,* 711 F.Supp. at 1271 n. 5, 1285.

representations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.'" *Zlotnick,* 836 F.2d at 821 (quoting *Peil,* 806 F.2d at 1161).

As to claims brought pursuant to the Exchange Act, Defendants do not oppose the certification of a class of purchasers of Tower Ordinary Shares between 25 May 1995 and 10 June 1996, represented by Elie Wurtman.[9] *See* Opposition Brief at 3.

### B. *Rule 23(a) Requirements*

#### 1. *Numerosity*

■ In order to satisfy the Rule 23(a) requirement of numerosity, the moving party must demonstrate the class is so "numerous that joinder of all parties is impracticable." Rule 23(a)(1). "Impracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members of the class calls for class certification." *Lerch,* 144 F.R.D. at 250; *see also Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). The number of potential class members is not, in and of itself, determinative of this question. *See General Tel. Co. Northwest v. Equal Employment Opportunity Comm'n,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (numerosity requirement imposes no absolute limitations); *Liberty Lincoln Mercury,* 149 F.R.D. at 73; *Harrison v. Simon,* 91 F.R.D. 423, 431 (E.D.Pa.1981).

Defendants raise no objection to finding the number of Tower Ordinary Share purchasers are so numerous as to make joinder impracticable. The absence of any objection, together with the allegation the Class consists of possibly thousands of purchasers situated throughout the United States, support the conclusion the Class is sufficiently numerous.

■ Defendants, however, do oppose the certification of a class of related options holders. *See* Opposition Brief at 20–21. Defendants argue Lead Plaintiffs have not offered proof anyone other than Meruelo purchased options during the class period. *See id.* at 20. While this may be true, Lead Plaintiffs do not seek to certify a subclass or to separate the options purchasers from the Tower Ordinary Share purchasers in any manner. *See* Reply Brief at 15. As such, Meruelo, even if he were the sole options purchaser, is simply one of thousands of purchasers of Tower securities for the purpose of this inquiry. Accordingly, for the reasons stated above, the numerosity requirement is met as to Meruelo.

#### 2. *Commonality*

■ The Rule 23(a) requirement of commonality is satisfied when "there are questions of law or fact common to the class." Rule 23(a)(2). This rule merely requires there be some question of law or fact common to the class. *See In re: Prudential Ins. Co. of America Sales Practice Litig.,* 148 F.3d 283, 310 (3d Cir.1998); *Liberty Lincoln Mercury,* 149 F.R.D. at 75; *Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397, 406 (D.N.J.1990). It is not necessary all questions of fact or law be common. *See In re Prudential,* 148 F.3d at 310 ("A finding of commonality does not require that all class members share identical claims, and indeed factual differences among the claims of the putative class members do not defeat certification"); *Weiss v. York Hosp.,* 745 F.2d 786, 809 (3d Cir.1984); *Liberty Lincoln Mercury,* 149 F.R.D. at 75.

■ The threshold for the commonality requirement is not high, *see In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir. 1986), and " 'will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the proposed class.' " *In re Prudential,* 148 F.3d at 310 (quoting *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994)).

#### a. The Exchange Act Claims

Defendants, by not opposing the certification of Wurtman as class representative, have not objected to finding the Exchange Act Claims of Lead Plaintiffs satisfy the commonality requirement of Rule 23. *See* Opposition Brief at 2–3. Specifically, the Defendants state that "at this stage of the pro-

---

9. Defendants reserved the right to move to decertify a class or challenge the length of the Class Period at a later time, if the circumstances warrant.

ceedings, they do not oppose the certification of a class of purchasers, represented by Elie Wurtman, of Tower *ordinary* shares ... who claim damages under Section 10(b) ... and Rule 10b–5." *Id.* at 3 (emphasis in original).

■ Plaintiffs have offered the following areas of commonality:

- Whether the federal securities laws were violated by Defendants' acts and omissions as alleged in the complaint;

- Whether the Defendants culpably participated in and pursued the common course of conduct alleged in the complaint and/or controlled other persons who committed primary violations of federal securities law;

- Whether documents, press releases and other statements disseminated by Defendants to the investing public and Tower shareholders during the Class Period misrepresented or omitted material facts about the business, products, sales, markets, financial condition and business prospects of Tower;

- Whether the market prices of Tower Ordinary Shares and related call options were artificially inflated during the Class Period Due to the material misrepresentations and failures to correct the material· misrepresentations as alleged in the Complaint; and

- To what extent the members of the Class have sustained damages and the proper measure of those damages.

*See* Complaint ¶ 25.

Because the establishment of commonality under Rule 23(a) is not designed to be a significant hurdle, *see Baby Neal,* 43 F.3d at 56; *In re School Asbestos Litig.,* 789 F.2d at 1010, these common questions of law and fact are sufficient to support a finding of commonality as to the Federal securities law claims. *See, e.g., In re Prudential,* 148 F.3d at 310 (finding commonality existed in class action alleging common scheme to defraud); *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 372 (D.Del.1990) (finding commonality existed because plaintiffs would each be required to prove 1) defendants issued misrepresentations; 2) with scienter; and 3) the

misrepresentations caused the market price of Beneficial stock to be artificially inflated).

**b. Pendent State Law Negligent Misrepresentation Claims**

Defendants argue state common law claims of negligent misrepresentation should not be certified because of the possible need to apply law from various states and nations. *See* Opposition Brief at 7 (arguing application of law from various states will require varying degrees of proof of actual reliance and privity). This argument, however, is best addressed under the more restrictive requirements ·imposed by the predominance inquiry of Rule 23(b)(3). *See Amchem,* 521 U.S. at ——, 117 S.Ct. at 2250 (the predominance criterion is far more demanding than the commonality requirement of Rule 23(a)(2)).

**3. *Rule· 23(a)(3) Typicality and Rule 23(a)(4) Alignment of Interests***

■ The typicality inquiry under Rule 23(a)(3) and the alignment of interest inquiry under Rule 23(a)(4) tend to merge. *See Georgine v.. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.1996), *aff'd, Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("We think that typicality is more akin to adequacy of representation: both look to the potential for conflicts in the class."); *Eisenberg,* 766 F.2d at 786; *Deutschman,* 132 F.R.D. at 373. Fundamentally, the purpose of the inquiries under Rules 23(a)(3) and (a)(4) is to ensure the class representatives do not have interests antagonistic to those of the class. *See In re Prudential,* 148 F.3d at 312; *Georgine,* 83 F.3d at 630; *Shamberg,* 111 F.R.D. at 695.

■ To establish typicality, a named plaintiff must demonstrate his or her legal theories or factual circumstances are not markedly different from those of the class. *See Georgine,* 83 F.3d at 631 ("[T]ypicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."); *Eisenberg,* 766 F.2d at 786; *Weiss v. York Hosp.,* 745 F.2d 786, 809 n. 36 (3d Cir.1984). " 'Rule 23 does not require that the representative plaintiffs have endured precisely the same injuries

that have been sustained by the class members, only that the harm complained of be common to the class.'" *Liberty Lincoln Mercury,* 149 F.R.D. at 77 (quoting *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988)); *see also In re Prudential,* 148 F.3d at 311.

■ Even when there are actual differences among the representative parties and the class, the Rule 23(a)(3) requirement of typicality may be met if "the claim arises from the same events or practice or course of conduct that gave rise to the claims of the class members, and if based on the same legal theory." *Grasty v. Amalgamated Clothing and Textile Workers Union,* 828 F.2d 123, 130 (3d Cir.1987); *see also In re Prudential,* 148 F.3d at 311. As a result, the typicality requirement is not met when the circumstances of the representatives or the legal theory upon which their claims are premised are notably different from circumstances or claims of the class members. *See Hassine,* 846 F.2d at 177; *Weiss v. York Hosp.* 745 F.2d 786, 809 n. 38 (3d Cir.1984); *Liberty Lincoln Mercury,* 149 F.R.D. at 77.

■ In addition, Rule 23(a)(4) mandates class representatives must fairly and adequately protect the interests of class members. *See Amchem,* 521 U.S. at ——, 117 S.Ct. at 2250; *In re Prudential,* 148 F.3d at 312; *Liberty Lincoln Mercury,* 149 F.R.D. at 78. The adequacy of a named plaintiff depends upon two factors: counsel for the named plaintiff must be qualified, experienced and generally able to conduct the proposed litigation and the named plaintiff must not have interests antagonistic to the class. *See In re Prudential,* 148 F.3d at 312; *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 800 (3d Cir.1995); *Liberty Lincoln Mercury,* 149 F.R.D. at 78.

The alignment of interest prong of Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at ——, 117 S.Ct. at 2250; *see also In re Prudential,* 148 F.3d at 312; *Georgine,* 83 F.3d at 630 ("[T]he interests of the named plaintiffs must be sufficiently aligned with those of the absentees").

### a. Alex Meruelo

■ Defendants challenge the typicality and adequacy of Meruelo on the following grounds: (1) the fraud on the market doctrine is inapplicable to the Euro Options; (2) even if the fraud on the market doctrine were applicable, the unique nature of the Euro Options makes them atypical of securities held by other class members; (3) the pre-disclosure purchases of Meruelo render him atypical and inadequate; and (4) the short sales of Meruelo render him atypical and inadequate.

■ Contrary to the assertions of Lead Plaintiffs, a preliminary inquiry into the applicability of the fraud on the market doctrine is appropriate when considering the merits of a motion for class certification. *See Falcon,* 457 U.S. at 155, 102 S.Ct. 2364 ("Evaluation of many questions entering into determination of class action is intimately involved with the merits of the claims."); *O'Neil v. Appel,* 165 F.R.D. 479, 496–97 (W.D.Mich.1996) ("[C]ourts have recognized a special need for factual scrutiny when class representatives seek to proceed on a fraud-on-the-market theory."); *Liberty Lincoln Mercury,* 149 F.R.D. at 73; *Cammer v. Bloom,* 711 F.Supp. 1264, 1287–93 (D.N.J. 1989). At this stage, however, Lead Plaintiffs need only carry the burden of proving the requirements of Rule 23 are met. *See Eisen,* 417 U.S. at 177–78, 94 S.Ct. 2140; *Deutschman,* 132 F.R.D. at 365. Lead Plaintiffs need not demonstrate the likelihood of success on the merits. *See Eisen,* 417 U.S. at 177–78, 94 S.Ct. 2140. Accordingly, a preliminary inquiry will be made to determine the applicability of the fraud on the market doctrine to the Euro Options.

In determining whether options holders could state a claim pursuant to Rule 10b–5, the Circuit observed "the market value of an option contract is responsive to changes in the market price of the underlying stock[;] holders of option contracts are susceptible to two separate types of deceptive practices: insider trading and affirmative misrepresentation." *Deutschman,* 841 F.2d at 504.

On remand, the district court in *Deutschman* found option purchases to be sufficient-

ly analogous to stock purchases to warrant a preliminary finding the fraud on the market theory was applicable to options purchases. *See* 132 F.R.D. at 371; *see also Moskowitz*, 128 F.R.D. at 630–32 (allowing call option purchasers to invoke fraud on the market theory absent convincing proof price played no role in the decision to purchase); *Tolan v. Computervision Corp.*, 696 F.Supp. 771, 776 (D.Mass.1988) ("Just as the trader in the underlying stock relies on market integrity, so too does the market trader.").

The *Deutschman* court based its decision to apply the fraud on the market theory to options primarily upon the efficiency of the market for the underlying stock. *See* 132 F.R.D. at 371. The Lead Plaintiffs have presented the affidavit of an expert, Dr. Anthony Saunders ("Dr. Saunders"), stating a "key factor in determining the value of an option is the price of the underlying stock." Saunders Aff. at 3. In this regard, it may be said that, to the extent the market for Tower Ordinary Shares was efficient, the market for Tower options may be viewed as efficiently priced. *See id.* at 4.

The statements of Dr. Saunders are consistent with findings made by courts addressing the applicability of the fraud on the market theory to option contracts. Accordingly, it cannot be said, at this stage, the fraud on the market theory is inapplicable to the Euro Options purchases.

The applicability of the fraud on the market theory to the Euro Options purchases does not, however, end the inquiry into the typicality and adequacy of Meruelo as a class representative. As explained by the expert of Lead Plaintiffs, the price of the underlying security is not the sole factor for determining the price of an option. *See* Saunders Aff. at 3–4. The maturity of an option, the volatility of the price of the underlying stock, the level of short term interest rates, and the competitive structure of the market in which the options are traded may also have important effects on the price of an option. *See id.* at 3.

In addition, as noted by Defendants, the Euro Options at issue in the present case, have not been shown to have been purchased by anyone other than Meruelo. *See* Opposi-

tion Brief at 20. During the class period there is no evidence any options related to Tower stock were openly traded. *See* Opposition Brief at 23.

Should Meruelo be certified as a class representative the following issues will need to be addressed at trial: (1) a factual explanation of the Euro Options; (2) whether the facts demonstrate the fraud on the market theory is applicable to the Euro Options; and (3) whether the damages of Meruelo need to be offset because of unique factors affecting the price of option contracts. The factual distinctions between Meruelo and the Tower Ordinary Share purchasers, combined with the possibility of unique defenses being raised against Meruelo, are likely to threaten to become the focus of the litigation. *See State of Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir.1997) ("When named plaintiffs are subject to unique defenses which could skew the focus of litigation, district courts properly exercise their discretion in denying class certification."); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990); *In re Frontier Insurance Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y.1997) ("[C]ourt may deny certification where the class representatives are subject to unique defenses which threaten to become the focus of litigation").

Lead Plaintiffs have advanced no compelling reason why the certification of Meruelo is either necessary or appropriate. The class action was created as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Falcon,* 457 U.S. at 155, 102 S.Ct. 2364. The class action device is designed to "save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Id.*

The certification of Meruelo, contrary to the goals of Rule 23, would only serve to create additional work and delay without providing any substantive support for the claims asserted by members of the Class. *See Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989) (expressing concern over attempt to

certify numerous class representatives when one class representative alone could adequately represent the class). Accordingly, Meruelo, as the purchaser of Euro Options, is neither a typical nor an adequate class representative for a class consisting primarily, if not exclusively, of purchasers of Tower Ordinary Shares.

In addition, Meruelo both purchased and sold all of his Tower Ordinary Shares before either of the purported corrective statements. These shares were sold at a profit. Thus, Meruelo will be subject to the defense of the inability to prove damages resulting from the alleged misrepresentation. *See* 15 U.S.C. § 78u–4(b)(4); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 408 (N.D.Ill.1987) (plaintiff who profited from sales of securities during the class period could not serve as class representative).

■ A named plaintiff is not a proper class representative if it is predictable a major focus of the litigation will involve an arguable defense unique to the named plaintiff or a small subclass. *See Suburban Propane Gas Corp.*, 123 F.3d at 1321; *Gary Plastic Packaging Corp.*, 903 F.2d at 180. The possible inability of Meruelo to prove damages resulting from his sales of Tower Ordinary Shares is likely to distract from the case of other class members. It appears Meruelo is an inadequate class representative as it relates to his purchase of Tower Ordinary Shares.

Also, some of the Tower Ordinary Share sales made by Meruelo during the class period were short sales. This fact raises questions concerning the ability of Meruelo to benefit from the fraud on the market theory. *See Zlotnick v. TIE Communications*, 836 F.2d 818, 822 (3d Cir.1988) (stating the presumption of reliance required by the fraud on the market theory will only be applied where it is logical to do so).

A short seller like Meruelo, purchases a stock because he believes the price of a stock overestimates its true value. *See Zlotnick*, 836 F.2d at 823. The *Zlotnick* Court found it was not reasonable to allow a purchaser to take advantage of a theory premised on the assumption the price of a given security reflected all available information when the purchaser sold the stock short on the belief the price did not reflect all available information. *See id.*

Pursuant to *Zlotnick*, it appears Meruelo will not be able to benefit from the fraud on the market theory to the extent he was a short seller. *See* 836 F.2d at 823. Therefore, to fully recover for any loss he may have suffered, Meruelo will have to prove actual reliance on the alleged misrepresentations of the Defendants. This is yet another distinction between Meruelo and the Class demonstrating his unsuitability to serve as a class representative. There are too many points of difference and possible contention between Meruelo and other members of the Class to allow him to be certified.

#### b. Anthony M. Weikel

■ Defendants argue Weikel is made atypical and inadequate by his "unique trading strategy." *See* Opposition brief at 30. The trading strategy of Weikel is said to be unique because Weikel purchased and sold approximately forty thousand shares within a four month period. *See id.* On one day Weikel bought 2,500 shares at $13¾, sold 1,000 shares at $13¼, sold 2,000 shares at $13¾, and purchased 600 shares at $13¾. *See id.* Defendants argue this trading activity suggests Weikel is a sophisticated or speculative investor.

Defendants contend, as a sophisticated investor, Weikel will not be able to benefit from a presumption of reliance under the fraud on the market theory. *See* Opposition Brief at 31. Defendants further contend Weikel will be subject to unique defenses which will render him atypical and inadequate. *See id.* Defenses which are unique to an individual named plaintiff may have the effect of prejudicing members of the proposed class. *See Suburban Propane Gas Corp.*, 123 F.3d at 1321; *Gary Plastic Packaging Corp.*, 903 F.2d at 180; *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1471 (S.D.N.Y.1983); *Kline v. Wolf*, 88 F.R.D. 696, 699 (S.D.N.Y.1981).

Defendants rely upon *Degulis v. LXR Biotechnology, Inc.*, 176 F.R.D. 123, 126 (S.D.N.Y.1997), *Weintraub*, and *Kline* to sup-

port the argument Weikel may not benefit from the fraud on the market theory. *See* Opposition Brief at 31. These cases, however, were decided either prior to the adoption of the fraud on the market theory by a plurality of the Supreme Court in *Basic,* or on the basis of allegations of actual reliance. *See, e.g., Degulis,* 176 F.R.D. at 126 (declining to decide whether sophisticated investor could benefit from fraud on the market theory because plaintiff also pleaded direct reliance); *Weintraub,* 564 F.Supp. at 1471 (finding sophisticated speculative investor was not an appropriate class representative prior to the acceptance of the fraud on the market theory); *Kline,* 88 F.R.D. at 699 (same).

■ Because a particular investor is sophisticated or engages in speculation does not mean the fraud on the market theory is inapplicable or the investor is an inappropriate class representative. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 506 (9th Cir. 1992) (demonstrating reliance under fraud on the market theory was not precluded on ground plaintiff was sophisticated investor); *Simpson v. Specialty Retail Concepts,* 149 F.R.D. 94, 101 (M.D.N.C.1993) ("[C]rucial issue is whether the claims of the class representative are typical of the claims of the class members, not whether there is a similarity in personal backgrounds or knowledge."); *MDC Holdings,* 754 F.Supp. at 802 (differences in investor sophistication do not prevent class certification); *Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989) (certifying a class representative who purchased stock on basis of takeover speculation, citing the applicability of the fraud on the market theory).

In the instant matter, Weikel relies upon the fraud on the market theory to prove reliance. The legal theories he proffers in support of his claims do not vary from those of the class. Accordingly, the background and knowledge of Weikel do not make him an improper class representative. *See, e.g., Hanon,* 976 F.2d at 506; *In re Electro–Catheter Sec. Litig.,* 1987–88 Transfer Binder, Fed. Sec.L.Rep. (CCH) ¶ 93,643 at 97,932, 1987 WL 47375 (D.N.J. 3 Dec. 1987) ("That one plaintiff may have decided to ... buy and then quickly resell shares, does not make his or her case atypical."). Weikel seeks recovery based upon the same facts and same legal theories as the members of the Class. Accordingly, it appears he is both a typical and adequate class representative.

c. David Lyons & Helene Carroll

■ Defendants argue Lyons and Carroll are inadequate class representatives because they purchased Tower Ordinary Shares after the 13 March 1996 Announcement. *See* Opposition Brief at 33. Defendants contend the 13 March 1996 Announcement was a corrective statement to the extent it concerned the expansion plans of Tower. *See id.* Defendants further contend this creates a conflict between Lyons and Carroll, on the one hand, and members of the Class who purchased shares before the 13 March 1996 Announcement, on the other. *See id.* at 33–34.

This conflict is said to arise "because an investor defrauded by a fraud on the market, as alleged here, maximizes recovery by maximizing the price inflation at the time of the purchase and minimizing it at the time of the sale or at the end of the class." *See* Opposition Brief at 34 (citing *Ravens v. Iftikar,* 1997 WL 405110 at \*17 (N.D.Cal.16 July 1997)). Defendants contend Lyons and Carroll have an incentive to minimize the importance of the March announcement, whereas purchasers before the 13 March 1996 Announcement would have an incentive to overinflate the importance of the announcement. *See id.* at 34–35 (asserting Lyons and Carroll lack incentive to vigorously pursue the expansion plan allegations).

Defendants primarily rely upon *In re Seagate Tech. II Sec. Litig.,* 843 F.Supp. 1341 (N.D.Cal.1994) to support a finding of inadequacy on the part of Lyons and Carroll. In addressing damages under Rule 10b–5, the *Seagate II* court stated a plaintiff suffers damages only to the extent of price inflation existing at the time of purchase. *See* 843 F.Supp. at 1357.

The *Seagate II* court found two forms of conflict could arise in a plaintiff class concerning proof of the amount of price inflation. *See id.* at 1359. First, there could be a conflict between those plaintiffs who sold shares on a particular day, and those who

purchased on that same day. *See id.* Second, there could be a conflict between those plaintiffs who still held their shares at the time of suit and those who sold all or a portion of their shares before the action was filed. *See id.*

As to these areas of conflict, the court stated, to the extent a seller on a given date attempts to cooperate with a purchaser on the same date, the recovery of the seller will necessarily be reduced. *See Seagate II*, 843 F.Supp. at 1361. The *Seagate II* court stated a seller's recovery is increased by minimizing the amount of price inflation existing on the date of sale. *See id.* at 1359. A purchaser on the same date, however, has the opposite interest. *See id.* Thus, the *Seagate II* court expressed concern over whether cooperation would be in the best interest of plaintiffs seeking to maximize their individual recovery. *See id.*

According to the *Seagate II* court, the question of price inflation bore substantially on the issues of reliance, materiality and proximate causation. The *Seagate II* court held, therefore, plaintiffs must present evidence establishing, to the extent conflicts exist, they will not be so serious as to preclude a finding of adequacy of representation. *See id.* at 1366.

Lead Plaintiffs responded to this argument by stating "[n]othing about the March 13 announcement was curative." *See* Reply Brief at 6. From this statement, it is difficult to discern if Lead Plaintiffs are abandoning claims of misrepresentation concerning growth and profitability. *See* Complaint ¶¶ 2, 119(a). Lead Plaintiffs further contend the 13 March 1996 Announcement falsely suggested any problems Tower was experiencing were not unusual and were being solved. *See* Reply Brief at 6–7.

It is not clear whether this effort of Lead Plaintiffs to deny the curative nature of the 13 March 1996 Announcement bespeaks of the very concerns raised by the Defendants. Given the reliance of Lead Plaintiffs on the fraud on the market theory, and the sharp decline in price that accompanied the 13 March 1996 Announcement, *see* Complaint ¶ 97, it appears Lead Plaintiffs may wish to claim the announcement was, at the very

least, partially curative of earlier misrepresentations.

A plaintiff in a civil action brought pursuant to the Exchange Act has "the burden of proving that the act or omission of the defendant alleged to violate [the] Act caused the loss for which the plaintiff seeks to recover damages." Section 21D of the Exchange Act, as amended, 15 U.S.C. § 78u–4. By denying the curative nature of the 13 March 1996 Announcement, Lead Plaintiffs may be foreclosing an opportunity to recover for the drop in price resulting from the 13 March 1996 Announcement.

■ At this stage, however, conflicts between Lyons and Carroll and other members of the Class remain theoretical and are likely to exist in any large securities fraud case. *See In re Intelligent Electronics, Inc. Sec. Litig.*, 1996 WL 67622 at *5 (E.D.Pa.13 Feb. 1996) (noting the conflicts discussed in *Seagate II* will exist in any large securities fraud case, even if the class period were only one day long). Any consideration of the purported conflict, therefore, must take in to account the favor with which the Third Circuit has viewed securities class actions. *See, e.g., Eisenberg*, 766 F.2d at 785 (securities fraud claims are particularly well suited for adjudication as class actions); *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3rd.Cir.1970); *Intelligent Electronics*, 1996 WL 67622 at *5. As a result, any doubt concerning the adequacy of a class representative should be resolved in favor of certification. *See Eisenberg*, 766 F.2d at 785; *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 552 (D.Colo.1998); *Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 394 (D.N.J.1996); *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa.1989).

The courts that addressed these intra-class conflicts before *Seagate II* did not find the conflicts to be so great as to warrant a denial of class certification. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir.1975) ("Courts have generally declined to consider conflicts, especially as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit."); *In re LTV Sec. Litig.*, 88 F.R.D. 134,

149 (N.D.Tex.1980); *Koenig v. Smith*, 88 F.R.D. 604, 607–08 (E.D.N.Y.1980); *B & B Investment Club v. Kleinert's, Inc.*, 62 F.R.D. 140, 144 (E.D.Pa.1974).

Courts addressing this issue after *Seagate II* have primarily declined to follow its reasoning. *See In re Mutual Savings Bank Sec. Litig.*, 166 F.R.D. 377, 384, 385 (E.D.Mich.1996) (finding subclassing is a manageable way to minimize any potential conflict); *In re Intelligent Electronics*, 1996 WL 67622 at *4 (denial of class certification based on purely theoretical conflicts is not warranted); *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 400–02 (D.Or.1996) (weight of precedent favors class certification); *In re Regal Comm. Corp. Sec. Litig.*, Fed.Sec.L.Rep. ¶ 98,871 (E.D.Pa.1995) ("contrary to *Seagate II*, it is the existence and materiality of a misstatement or omission that is central, and from it, price inflation and reliance are presumed"); *Welling v. Alexy*, 155 F.R.D. 654, 662 (N.D.Cal.1994) ("We altogether disagree ... that such potential conflicts afford a valid reason at this time for refusing to certify a class."); *In re AST Research Sec. Litig.*, Fed.Sec.L.Rep. ¶ 98,466, 1994 WL 722888 (C.D.Cal.1994) ("Any conflicting interests in trading fluctuations in inflation during the class period are secondary."); *Yamner v. Boich*, Fed.Sec. L.Rep. ¶ 98,427, 1994 WL 514035 (N.D.Cal. 1994) (disagreeing with the view expressed in *Seagate II* that conflicts over price inflation are essentially conflicts over liability issues such as materiality); *In re Scorpion Technologies*, Fed.Sec.L.Rep. ¶ 98,600, 1994 WL 774029 (N.D.Cal.1994); *but see Ziemack v. Centel Corp.*, 163 F.R.D. 530, 541 (N.D.Ill. 1995) (indicating price inflation conflict goes to liability issue of materiality); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 484 (W.D.Mich.

1994) (indicating that class conflict goes beyond damages issue).

Given the weight of authority, and the favor with which this Circuit views Federal securities law class actions, the reasoning of *Seagate II* will not be followed. Any concerns that may arise can be adequately addressed by the creation of subclasses.[10] *See, e.g., Falcon*, 457 U.S. at 160, 102 S.Ct. 2364; *Blackie*, 524 F.2d at 911 (finding potential for conflicts were, at most, peripheral given ability of trial judge to supervise class action and create subclasses if need arose); *Easton v. Mutual Benefit Life Ins. Co.*, Fed.Sec.L.Rep. ¶ 97,348, 1993 WL 89146 (D.N.J.1993); *In re LTV Securities Litigation*, 88 F.R.D. at 149; *see also* Fed.R.Civ.P. 23(c)(1, 4).

Defendants have not challenged, at this stage, the certification of a class of all purchasers of Tower Ordinary Shares between 25 May 1995 and 10 June 1996 seeking recovery pursuant to Section 10(b) and Rule 10b–5. *See* Opposition Brief at 3. Given the Class, as currently agreed to by the Defendants, will include those who purchased Tower Ordinary Shares after the 13 March 1996 Announcement there is no reason these members should not be represented, as suggested in the Motion for Class Certification.

In the instant matter, the Lead Plaintiffs allege a continuous scheme to defraud. The interests of Lyons and Carroll in proving this scheme are sufficiently aligned with other members of the class to support a finding of adequacy. *See In re Prudential*, 148 F.3d at 313 (proposed class representatives satisfied the adequacy requirement because, like members of the class, each had an interest in demonstrating existence and implementation of scheme to defraud); *In re Mutual Savings Bank*, 166 F.R.D. at 385 ("Although different class members may be concerned with prov-

10. Even after certification of a class is ordered, an opportunity to modify the class in light of subsequent developments in the litigation remains available. *See Falcon*, 457 U.S. at 160, 102 S.Ct. 2364. This flexibility is designed to enhance the usefulness of the class action device. *See id.*

Rule 23(c)(1) allows a class to be altered or amended at any time before a decision on the merits. *See* Rule 23(c)(1). Rule 23(c)(4) allows a district court, when appropriate, to divide a class into subclasses. *See* Rule

23(c)(4). These rules combine to give a court the power to certify subclasses as the case progresses and the nature of the proof to be developed at trial becomes clear. *Marisol v. Giuliani*, 126 F.3d 372, 379 (2d Cir.1997); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) ("District courts retain substantial discretion in managing cases and ... the district judge may of course take [necessary] measures, such as redefining the class and creating subclasses.").

ing the materiality of different misstatements, depending on their dates of purchase, in a case such as this one, where the alleged omission of information persisted throughout the class period, all class members will have a strong interest in showing that this omission was material."). This conclusion is supported by the favor with which securities fraud class actions are viewed in this Circuit. *See, e.g., Eisenberg,* 766 F.2d at 785; *In re Intelligent Electronics,* 1996 WL 67622 at *5. Should conflicts arise within the class, they may be properly dealt with by amendment of the class or the creation of subclasses. Accordingly, the potential for conflict related to date of purchase does not render Lyons and Carroll inadequate.

> d. Challenges to the Credibility, Knowledge and Interest of the Lead Plaintiffs Seeking Certification.

Defendants raise several challenges to the adequacy of the Lead Plaintiffs related to credibility, knowledge of the facts of the case and lack of a vested interest in proceeding with this action. Specifically, Defendants argue Weikel has not demonstrated he will be available to attend trial. *See* Opposition Brief at 32. Defendants further argue Carroll did not lose money on her purchases and is simply seeking to vindicate the rights of others. *See id.* at 36–38. Additionally, Defendants contend Weikel and Meruelo demonstrated "an obvious lack of credibility" at their depositions. *See id.* at 30, 32. Lastly, Defendants argue Lyons lacks any motivation to pursue this action to its end. *See id.* at 38–40.

▇ Defendants argue Weikel has suggested he will be unable to attend trial, rendering him an inadequate class representative. *See* Opposition Brief at 32 (citing Weikel Dep. at 194–95). When asked if he would be available to testify at trial, Weikel stated, "It depends on the day and things like that. There are some days where I do surgery." *See* Weikel Dep. at 194. When asked how much advance notice he would require, Weikel stated: "It could require six, seven weeks." *See id.* at 194–95.

In light of the availability of other adequate class representatives, the potential unavailability of Weikel renders him an inadequate class representative. The fact Weikel may not be readily available to attend trial has the potential for seriously interfering with his obligation to vigorously prosecute this action. *See Cammer,* slip op. at 48–49 (finding potential class representative inadequate when the possibility existed he would be unable to travel to trial). A trial court simply cannot operate as Weikel suggests. Weikel may request six or seven weeks advance notification of trial with the concomitant requirement that the trial start precisely as Weikel has been notified. This is simply not workable.

It would be inappropriate to subject members of the Class to potential trial delays created by a class representative. *See, e.g., Marisol v. Giuliani,* 126 F.3d 372, (2d Cir. 1997) (requirement of adequacy is motivated by concerns of efficiency and fairness to the class). Concern for the prevention of trial delays has been given added importance by the passage of the Civil Justice Reform Act. *See* 28 U.S.C. § 471 *et seq.; cf.* The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (addressing concerns for trial delays in the criminal context); *United States v. Hamilton,* 46 F.3d 271, 275 (3d Cir.1995) (observing if case is not brought to trial within specified period of time, Speedy Trial Act requires dismissal of indictment upon motion of defendant). The purpose of the Civil Justice Reform Act is to "ensure just, speedy, and inexpensive resolution of civil disputes." *See id.* § 471.

A civil trial, however, may be delayed by the need to comply with the Speedy Trial Act. *See, e.g., United States v. Claros,* 17 F.3d 1041, 1042 (7th Cir.1994) (observing criminal case, involving defendants who had been in custody for two months, took precedence over scheduled civil trial); *American Cyanamid Co. v. Picaso–Anstalt,* 741 F.Supp. 1150, 1157–58 (D.N.J.1990) (citing 18 U.S.C. § 3161) ("[R]esolution of civil matters is often delayed by the precedence which must be accorded criminal matters pending before the Court."). Therefore, even if Weikel were given six to seven weeks notice, a criminal case could intervene during that

time. The delay created by the intervening criminal case would be compounded by the need to again provide Weikel advance notice of the new trial date.

In the instant matter, the presence of Weikel as a named plaintiff would likely subject the proceedings to delay. Accordingly, Weikel is an inadequate representative for the Class.

■ Defendants also argue Weikel and Meruelo demonstrated a lack of credibility which renders them inadequate class representatives. *See* Opposition Brief at 32. Defendants allege Weikel, in his deposition, "made up the fact" Morgenstern was involved in insider trading. *See id.* (citing Weikel Dep. at 184–87). Defendants argue this statement is inconsistent with interrogatory responses provide by Lead Plaintiffs stating they were unaware of the names of the alleged insider traders. *See id.* Lead Plaintiffs counter the statement of Weikel merely represented his beliefs, while the responses to interrogatories reflected facts currently in the possession of Lead Plaintiffs. *See* Reply Brief at 11.

■ Problems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative. *See Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981), *vacated on other grounds,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510–11 (N.D.Ill.1990) (counsel for plaintiff was at least silent partner in, and at most encouraged, false testimony of plaintiff). At this stage of the matter, however, attacks on credibility are not often given much weight. *See Goldstein v. Cytogen Corp.,* 1993 WL 274246, at \*3 (D.N.J. June 7, 1993); *Cammer,* slip. op. at 39–40; *Tolan v. Computervision,* 696 F.Supp. 771, 780 (D.Mass.1988) (noting attacks on credibility are less relevant when recovery is based upon the fraud on the market theory).

The statements of Weikel do not appear to be in such conflict with the interrogatory responses as to raise serious questions as to his credibility. Accordingly, it appears Weikel is not an inadequate class representative on the basis of credibility.

■ Defendants attack the credibility of Meruelo on the basis of his evasiveness and inability to recall certain facts. *See, e.g.,* Opposition Brief at 28 (citing Meruelo Dep. at 88) (claiming not to remember if he lost more than $10 or more than $500,000 on his investment in the Euro Options); *id.* at 184–85 (failure to recall if he invested in more than three or one thousand companies). While these issues may impact on the credibility of Meruelo, were he to testify at trial, they do not create such serious concern as to warrant a finding of inadequacy on the basis of lack of credibility. *Contrast Kaplan,* 132 F.R.D. at 510–11.

Viewing the deposition of Meruelo in its entirety it appears, at least in part, the responses of Meruelo may be explained by the volume and complexity of his investments. Meruelo, therefore, is not an inadequate representative on the basis of lack of credibility.

■ As to Carroll, Defendants argue she has suffered no injury and has no standing to bring this suit. *See* Opposition Brief at 36 (citing *PBA Local No. 38 v. Woodbridge Police Dep't,* 134 F.R.D. 96, 99 (D.N.J. 1991); *Britt v. McKenney,* 529 F.2d 44, 45 (1st Cir.1976); *Katz,* 117 F.R.D. at 407–08)). In order to have standing to bring a suit, a plaintiff must have "a 'personal stake' in the outcome of the suit demonstrating both a 'distinct and palpable injury.'" *PBA Local No. 38,* 134 F.R.D. at 99 (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ Defendants argue Carroll testified she did not lose any money in her Tower investments, *see* Opposition Brief at 36 (citing Carroll Dep. at 70, 93), and she seeks merely to vindicate the alleged harm to others. *See id.* (citing Carroll Dep. at 39–40). Defendants base their standing argument solely upon the statements made by Carroll concerning her damages. While it is true a plaintiff cannot acquire standing by virtue of bringing a class action, *see PBA Local No. 38,* 134 F.R.D. at 100, it is also true a representative is not required to have a complete understanding of the legal basis for recovery. *See In re Cephalon Sec. Litig.,* 1998 WL 470160, at \*3 (E.D.Pa. Aug. 12, 1998) ("It is

unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim. It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims"); *Smith v. Dominion Bridge Corp.*, 1998 WL 98998, at *5 (E.D.Pa. March 6, 1998); *see also* Carroll Dep. at 88 (understanding her role in this action to be to provide assistance in any way possible for the sake of the plaintiffs). Accordingly, the statements of Carroll concerning her perceived lack of monetary loss are not dispositive of the issue of standing.

It appears Carroll may have testified she did not lose any money in her Tower investments because of gains received from post-Class Period purchases and dividends. *See* Moving Brief at 23. Carroll, however, purchased two thousand Tower Ordinary Shares during the class period at $14¼ per share. *See id.* Carroll still held these shares on 11 June 1996, the close of the Class Period. *See id.* On 11 June 1996 Tower Ordinary shares closed at $10 ⅞ per share, leaving Carroll with a potential loss of $6,860. *See id.* (citing *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 190 (3d Cir.1981) (stating damages recoverable pursuant to Rule 10b–5 equal the price paid minus the fair market value of the security absent the misrepresentations); *Jaroslawicz v. Engelhard Corp.*, 724 F.Supp. 294, 298 (D.N.J.1989)).

In addition, Carroll testified "the stock had been sold to me at an inflated price and it wouldn't have been worth that much had the truth been out." *See* Carroll Dep. at 40. While Carroll may not have completely understood what would constitute a recoverable loss in this action, no evidence presented by Defendants supports the conclusion Carroll did not suffer damages sufficient to give her standing to bring this suit. Accordingly, it appears, at the moment, Carroll is an adequate class representative.

 Lastly, as to Lyons, Defendants argue his personal relationship with counsel and his unwillingness to proceed with related litigation in which he was the sole plaintiff demonstrate he will not adequately represent the Class. *See* Opposition Brief at 38–40.

An associate of the firm representing Lead Plaintiffs is a mutual friend of Lyons and his brother. *See id.* at 38. Lyons joined this action after communicating with this friend and determining he was unwilling to bear the costs of litigation on his own. *See* Lyons Dep. at 52,91.

 Defendants argue due process requires a class representative to be more than merely pro forma—to do more than merely blindly rely upon counsel. *See* Opposition Brief at 39 (citing *In re Goldchip Funding Co.*, 61 F.R.D. 592, 594 (M.D.Pa.1974)); *see also In re General Motors Corp.*, 55 F.3d at 784 ("The protection of absentees' due process rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys."). A personal relationship with a member of the law firm representing named plaintiffs does not, standing alone, warrant a finding undue reliance upon counsel. *See Lewis v. Goldsmith*, 95 F.R.D. 15, 20–21 (D.N.J.1982) (certifying a class representative with a familial relationship to class counsel).

In the instant matter, Lyons has reviewed the Complaint, reviewed interrogatories of the Defendants, described the steps counsel took in the investigation made in connection with this action, stated he knew of his responsibilities of a class representative, stated the basis for his claims, and stated he is willing to testify at trial. *See* Carroll Dep. at 12–16, 20–21, 47–50, 94, 103. It appears Lyons has more than a mere pro forma involvement in this action.

In addition, the fact Lyons will not be responsible to bear any costs of this action does not defeat his request to be appointed class representative. *See, e.g., Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir.1991) (no per se rule requires representative plaintiff to be willing to bear costs of litigation to satisfy requirement of adequacy); *Vanderbilt v. Geo–Energy Ltd.*, 725 F.2d 204, 210 (3d Cir.1983). Defendants cite *In re ML–Lee Acquisition Fund II and ML–Lee Acquisition Fund (Retirement Accounts) II Sec. Litig.*, 149 F.R.D. 506, 509 (D.Del.1993), for the proposition a putative class representative must convince the court he or she is

financially capable of bearing the burdens of class representation. *See id.* at 509. Defendants argue the fact Lyons did not wish to bear the burden of proceeding on his own, at a cost of approximately $5,000, demonstrates he is not suitable to be a class representative. *See* Opposition brief at 39.

In the instant matter, counsel for Lead Plaintiffs have agreed to advance the costs of suit. *See* Moving Brief at 31. In the event this action is not successful Wurtman has agreed to reimburse counsel for litigation expenses and have proffered evidence of their ability to do so. *See id.* Lyons, Carroll and Meruelo are not obligated to reimburse counsel for any expenses. *See id.*

The primary concern of the court in *In re ML–Lee* was that "a Court must be satisfied that a Plaintiff's resources are sufficient to preclude the possibility that a Plaintiff could be coerced into complying with an attorney's advice ... because of a potential threat of funding revocation." 149 F.R.D. at 509. No such concern is present here. Because Lyons has no obligation to pay the expenses of litigation, regardless of the outcome, there is no possibility the threat of funding revocation will lead to coercion. Accordingly, it appears Lyons is an adequate class representative.

### 4. *Adequacy of Counsel*

The adequacy of counsel is determined by reviewing the qualifications, competence and experience of the attorneys representing the plaintiffs. *See Weiss,* 745 F.2d at 811; *Liberty Lincoln Mercury,* 149 F.R.D. at 78, *Smith v. Dominion Bridge Corp.,* 1998 WL 98998 at *4 (E.D.Pa. March 6, 1998). The adequacy of representation requirement encompasses the concerns of whether "the [class] representatives and their attorneys will competently, responsibly and vigorously prosecute the suit." *See Liberty Lincoln Mercury,* 149 F.R.D. at 78 & n. 23.

The Defendants do not contest the qualifications, competence and experience of class counsel. In addition, it is evident from a review of the resumes of Cohn Lifland Pearlman Hermann & Knopf, Liaison Counsel for Lead Plaintiffs, and Milberg Weiss Bershad Hynes & Lerach, Lead Counsel for Plaintiffs, and the resumes of the firms serving as the Executive Committee for Lead Plaintiffs that these firms have extensive experience in representing members of securities law class actions.[11] *See* Schulman Aff. Exhs. F–O. Accordingly, the counsel of Lead Plaintiffs are adequate.

### C. *Rule 23(b)(3) Requirements*

#### 1. *Predominance of Common Issues of Law or Fact*

Rule 23(b)(3) states a class action may only be maintained if the court finds the questions of law or fact common to the class predominate over any questions affecting only individual members. *See* Rule 23(b)(3). The predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Amchem,* 521 U.S. at ——, 117 S.Ct. at 2249. While damages for each class member may prove to be different, this fact alone should not preclude class certification when common issues concerning liability predominate. *See In re Prudential,* 148 F.3d at 314 (" 'Predominance is a test readily met in certain cases alleging consumer or securities fraud.' ") (quoting *Amchem,* 521 U.S. at ——, 117 S.Ct. at 2250); *Bogosian v. Gulf Oil,* 561 F.2d 434, 456 (3d Cir. 1977).

#### a. Exchange Act Claims

Concerning the Exchange Act Claims of purchasers of Ordinary Shares before 13 March 1996, Defendants do not argue the common issues of law or fact fail to predominate over questions affecting only individual members. The present case, involving alle-

---

**11.** By order, dated 8 November 1996, Judge Bissell appointed Milberg Weiss Bershad Hynes & Lerach as lead counsel, Cohn Lifland Pearlman Hermann & Knopf as liaison counsel, Milberg Weiss as chair of the executive committee, and the firms of Lowey, Dannenberg, Bemporad & Seligener; Stull, Stull & Brody; Wolf Halden-stein Adler Freeman & Herz and Zwerling, Schacter, Zwerling & Koppell as members of the executive committee. *See* 8 November 1996 Order. While the appointment of so many firms may be questioned, this order will not be revisited; it appears to be the law of the case.

gations of a common scheme to defraud falls within the category of cases for which the predominance requirement is easily met. *See In re Prudential,* 148 F.3d at 314.

In the instant matter, class representatives will rely upon proof of facts and legal theories common to all members of the class. Accordingly, the common questions of law and fact predominate over any issues affecting only individual members. *See, e.g., In re Prudential,* 148 F.3d at 314–15 (certifying class in which questions of law and fact concerning common scheme to defraud insurance policy holders predominated); *In re Cephalon,* 1998 WL 470160 at *4 (certifying class as to Federal securities law claims because common questions concerning whether defendants made fraudulent statements which caused the stock of Cephalon to be artificially inflated predominated).

b. Pendent State Law Negligent Misrepresentation Claims

■■■■ Defendants argue the application of law from various states causes individual questions to predominate over the common questions of law or fact. In particular, Defendants argue the questions of individual reliance [12] and privity will cause the trial to improperly focus on individual issues. *See* opposition Brief at 7–19.

■■■■ The predominance requirement is not met when there exists a great number of significant questions peculiar to the individual members of the class. *See Amchem,* 521 U.S. at ——, 117 S.Ct. at 2250. The predominance inquiry, therefore, must encompass a determination of the applicable law. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 823, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (the Constitution places limits on the law that may be applied to the claims of individual class members); *Georgine,* 83 F.3d at 627; *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.,* 174 F.R.D. 332, 340 (D.N.J.1997). Distinctions amongst

members of the Class may be "compounded exponentially" by the application of law from various forums. *See Georgine,* 83 F.3d at 627.

■■■■ "In construing matters of State law in pendent claims or in state law matters otherwise subsidiary to its federal question jurisdiction, a federal court . . . is duty-bound to apply the law of the state in which it sits." *See Cooper v. Borough of Wenonah,* 977 F.Supp. 305, 311 (D.N.J.1997); *Vargas v. Calabrese,* 714 F.Supp. 714, 719 (D.N.J.1989); *aff'd in relevant part* 949 F.2d 665 (3d Cir. 1991); *see also Georgine,* 83 F.3d at 627 ("We must apply an individualized choice of law analysis to each plaintiffs' claims."). In a federal question case, a District Court entertaining pendent state claims should follow the choice of law rules of the forum state. *Shields v. Consolidated Rail Corp.,* 810 F.2d 397, 399 (3d Cir.1987); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (district court sitting in diversity must apply choice of law rules of forum state); *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996) (same).

■■■■ In applying the choice of law principles of New Jersey, a court must balance the interests of the various forums involved. *See In re Ford Motor Co.,* 174 F.R.D. at 348 (citing *Gantes v. Kason Corp.,* 145 N.J. 478, 679 A.2d 106 (1996)); *Pfizer, Inc. v. Employers Ins. of Wausau,* 154 N.J. 187, 192, 712 A.2d 634 (1998) ("New Jersey courts seek to apply the law of the state with the greatest interest in resolving the particular issue that is raised"). A court must compare "the interests of the states whose laws are potentially involved in the underlying action and determine which state has the greatest interest in having its law applied." *In re Ford,* 174 F.R.D. at 348. "The qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should

12. Contrary to Federal securities law, which allows a presumption of reliance pursuant to the fraud on the market theory, state law negligent misrepresentation claims require proof of actual reliance. *See In re General Motors Corp.,* 55 F.3d at 783; *Peil;* 806 F.2d at 1163 n. 17; *Cammer,* 711 F.Supp. at 1298. *But see In re Zenith Lab.*

*Sec. Litig.,* 1993 WL 260683 at *12 (D.N.J.11 Feb.1993) (incorporating fraud on the market theory into element of misrepresentation claim that, under New Jersey law, imposes liability on defendants for losses incurred by the reasonably foreseeable victims of their misrepresentations).

apply." *See D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 523, 628 A.2d 305 (1993); *General Ceramics Inc. v. Firemen's Fund Ins. Co.*, 66 F.3d 647, 656 (3d Cir.1995) (focus is on whether the application of the law of a given forum will advance the policies that law was intended to promote).

Lead Plaintiffs argue New Jersey law should apply to the claim of every class member. *See* Moving Brief at 39. Lead Plaintiffs contend New Jersey has the greatest interest in having its law applied to these claims because false and misleading information was prepared and disseminated in this state, DSSI exercised control over Tower from this state, and Tower maintained office at DSSI in this state. *See id.*

A similar argument was raised in *In re Ford Motor* There, the plaintiffs argued the laws of Michigan should apply to a products liability class action because Ford Motor Company was headquartered in Michigan, the vehicles in question were manufactured in Michigan, the decisions related to the allegedly defective ignition switches were made in Michigan, and any misrepresentations regarding the vehicles originated in Michigan. *See In re Ford Motor Co.*, 174 F.R.D. at 348.

The *In Re Ford Motor Co.* court held the laws of the states of the individual plaintiffs would apply. *See* 174 F.R.D. at 348. The court stated "[e]ach plaintiff's home state has an interest in protecting its consumers from instate injuries caused by foreign corporations and in deciding the scope of recovery for its citizens under its own laws." *See id.* Review of the laws of the individual states led the court to conclude individual questions of law would predominate and class certification was, therefore, not proper. *See id.* at 351.

In the instant matter, the logic of *In re Ford Motor Co.* is clearly applicable. Lead Plaintiffs argue false information was prepared and disseminated in New Jersey, and DSSI exercised control over Tower from New Jersey. *See* Moving Brief at 39; Complaint at ¶¶ 8, 12. These facts provide a less compelling argument for the application of New Jersey law to every member of the Class than was presented in *In re Ford Motor Co.* for the application of Michigan

law. It appears some of the statements at issue in the present case may have been prepared and disseminated in New Jersey. A significant portion of Lead Plaintiffs allegations, however, concern the activities of an Israeli corporation and statements emanating from Israel.

States have a clear interest in protecting their consumers and in delineating the grounds for recovery. *See David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir. 1994) (state has obvious interest in providing redress for injuries that occurred there); *In Re Ford Motor Co.*, 174 F.R.D. at 348. Accordingly, the law of the states of the individual members of the Class is likely to be applied in this action. *Cf. Zinberg*, 138 F.R.D. at 411–12 (applying New Jersey law to claims of all class members because defendant had its principal place of business in New Jersey, many class members were likely to be New Jersey residents, and many of the statements at issue emanated from corporate offices within the state).

█ In a motion for class certification, plaintiffs bear the burden of providing an analysis of the variations of state law to determine whether common issues will in fact predominate. *See Castano*, 84 F.3d at 750 ("Prior to certification, the district court must determine whether variations in state law defeat predominance"); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C.Cir. 1986); *In re School Asbestos Litig.*, 789 F.2d at 1010; *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 492–93 (E.D.Pa.1997) (denying certification because plaintiffs did not offer a workable plan as to how litigation could proceed in light of numerous individual issues); *In re Ford Motor Co.*, 174 F.R.D. at 349; *cf. In re Prudential*, 148 F.3d at 315 (finding class certification appropriate where plaintiff "compiled a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims").

In the instant matter, Lead Plaintiffs have offered neither proof nor analysis regarding variations in state law. Rather, they argue if the law of New Jersey does not apply to all class members, potential conflicts of law is-

sues are not a basis to deny class certification in this district. *See* Moving Brief at 39 (citing *Gunter v. Ridgewood Energy Corp.,* 164 F.R.D. 391, 399 (D.N.J.1996)) (choice of law concerns are virtually never a bar to class certification); *Zinberg,* 138 F.R.D. at 411 (courts in this district overwhelmingly favor certification of pendent state law claims). These cases, however, rested upon the conclusion the differences in state law would be minimal or would differ only as to the question of reliance.

Defendants argue the application of the law from different states will cause the questions of individual reliance and privity to predominate over questions common to the class. *See* Opposition Brief at 13–19 (citing *Mirkin v. Wasserman,* 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, 579–81 (Cal. 1993) (fraud on the market not applicable in California, where Meruelo resides); *Kahler v. E.F. Hutton & Co.,* 558 So.2d 144, 145 (Fla.Dist.Ct.App.1990) (fraud on the market theory not applicable in Florida, where Carroll resides); *Prudential Ins. Co. v. Dewey Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 590 N.Y.S.2d 831, 605 N.E.2d 318 (N.Y.1992) (plaintiffs are limited to those in privity with defendants in New York, where Lyons resides); *Page v. Frazier,* 388 Mass. 55, 445 N.E.2d 148, 153–54 (Mass.1983) (in Massachusetts, where Weikel resides, plaintiffs limited to those in privity with defendants, unless defendants knew plaintiffs relied on misstatement)).

Courts in this circuit have found it to be an abuse of discretion to deny class certification on the sole ground of differences concerning individual issues of reliance. *See Eisenberg,* 766 F.2d at 786–87; *but see Peil,* 806 F.2d at 1159 n. 8 (finding district court had not abused its discretion in denying certification upon finding individual questions of reliance would predominate). *Eisenberg* marked the beginning of a trend in which lower courts in this circuit have certified pendent negligent misrepresentation claims after finding common questions concerning the existence of any misrepresentations, their materiality and the intent of defendants predominated over individual questions of reliance. *See, e.g., In Re Bell Atlantic Corp. Sec. Litig.,* 1995 WL

733381, at *7 (E.D.Pa.11 Dec.1995); *In re Regal Comm. Corp. Sec. Litig.,* 1995 WL 550454, at *9–10 (E.D.Pa.14 Sept.1995); *Zinberg,* 138 F.R.D. at 411–12; *In re ORFA Sec. Litig.,* 654 F.Supp. 1449, 1459–62 (D.N.J. 1987).

The Circuit, in *Eisenberg,* found class actions were a particularly appropriate means for resolving securities fraud claims because "the effectiveness of the securities laws may depend in large measure on the application of the class action device." 766 F.2d at 785 (quotation omitted). At the time, the Circuit feared that allowing individual questions of reliance to prevent certification of a class would eliminate the possibility of any class action proceeding pursuant to Rule 10b–5. *See id.* at 786.

The cases extending the *Eisenberg* decision to encompass certification of pendent state law claims have addressed the reliance issue as being the only individual question that could arise during the course of litigation. *See, e.g., In re Bell Atlantic Corp. Sec. Litig.,* 1995 WL 733381 at *7; *In re Regal Comm. Corp. Sec. Litig.,* 1995 WL 550454 at *9–10; *Zinberg,* 138 F.R.D. at 411; *In re ORFA Sec. Litig.,* 654 F.Supp. at 1459–62. In the instant matter, however, Defendants argue individual questions of both reliance and privity will arise at trial. The need for some members of the class to prove individual reliance, or privity with Defendants, or both, places Lead Plaintiffs in the position of being both factually and legally distinct from the Class. *See Georgine,* 83 F.3d at 632.

Lead Plaintiffs failed, in both the Moving Brief and the Reply Brief, to offer either an explanation or an analysis of how the individual questions of reliance and privity could be presented at trial in a workable manner. Unlike the plaintiffs in *In re Prudential,* Lead Plaintiffs have not offered a comprehensive analysis of the laws potentially applicable in this action. *See* 148 F.3d at 315.

The failure of Lead Plaintiffs to provide an explanation or analysis of the laws of the interested forums prevents a finding the law of New Jersey should be applied to the claims of each member of the Class. *See General Ceramics,* 66 F.3d at 656 (determination of applicable law requires court to

analyze the purpose behind the laws of the various forums involved to discern if more than one state has an interest in the matter). Lead Plaintiffs also have failed to meet their burden of demonstrating common questions of law and fact will predominate over questions specific to individual class members should the laws of various forums be applied. *See, e.g., Castano,* 84 F.3d at 742 (given plaintiff's burden of establishing class certification, court cannot rely on unsupported assurances of counsel that any problems with predominance can be overcome). Accordingly, the state law negligent misrepresentation claims will not be certified as a class action.

### 2. The Superiority of Proceeding as a Class Action

The decision as to whether proceeding as a class action is superior is guided by Rule 23(b)(3). A court addressing the superiority inquiry should consider:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Rule 23(b)(3).

 Defendants present no opposition to the superiority of proceeding as a class action concerning the Exchange Act Claims. In addition, Lead Plaintiffs allege no related action has been commenced and there is no evidence any member of the Class would prefer to individually control the prosecution of the case. *See* Moving Brief at 36. Accordingly, proceeding as a class action for the Exchange Act Claims is superior to other available methods of adjudication of this controversy.

Proceeding as a class action will "avoid taxing the court with a barrage of lawsuits adjudicating the same issues and involving the same defendants." *Zinberg,* 138 F.R.D. at 410. In addition, a class action will allow smaller purchasers a chance at recovery that might otherwise not be available. *See id.* Lastly, the claims and issues raised in this case are not extraordinary; no significant difficulties managing this action are anticipated. *See, e.g., Eisenberg,* 766 F.2d at 785 (stating Federal securities fraud claims are particularly well suited to proceeding as class actions).

As to the pendent state law claims, the conclusion individual issues will predominate over common questions of law and fact renders proceeding as a class action an inferior method for adjudicating those claims.

### D. Is There a Need for More Than One Class Representative

 Defendants argue one class representative would be sufficient in this action. *See* Moving Brief at 27 (citing *Cammer,* slip op. at 3 n. 1). Defendants further argue Lead Plaintiffs have failed to offer a reason as to why there is a need for more. *See id.*

In *Cammer,* the court was presented with a motion seeking to certify ten class representatives. *See Cammer,* slip op. at 3 n. 1 Of primary concern was the avoidance of unnecessary work and delay. Aside from arguments proffered to demonstrate the proposed class representatives fail to meet the requirements of Rule 23, no arguments demonstrating the certification of three class representatives will prove burdensome have been presented.

While Lead Plaintiffs original attempt to certify ten class representatives may have proven problematical, it appears the certification of three class representatives will not present the court with the problems addressed in *Cammer.* Those certified as class representatives in this matter represent a cross-section of the members of the Class.

### Conclusion

For the reasons stated, the Motion for Class Certification is granted with respect to a class of purchasers of Tower Ordinary Shares between 25 May 1995 and 10 June 1996 seeking relief pursuant to the Exchange Act. Wurtman, Lyons and Carroll are certified as class representatives. Weikel and Meruelo, however, are found not to be proper

class representatives as defined by Rule 23(a). The Motion for Class Certification is denied as it pertains to the pendent state law claims.